STATE of Wisconsin, Plaintiff-Respondent,

v.

Damon Keith SUTTON, Defendant-Appellant.

Court of Appeals

*No. 2011AP36–CR. Submitted on briefs November 11, 2011.
—Decided December 6, 2011.*

2012 WI App 7

(Also reported in 808 N.W.2d 411.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Maayan Silver of Gamiño Law Offices, LLC*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Mark A. Neuser*, assistant attorney general.

Before Fine, Kessler and Brennan, JJ.

¶ 1. FINE, J. Damon Keith Sutton appeals the judgment entered on his guilty plea to unlawfully possessing three grams or fewer of a prohibited drug, Ecstasy (3,4–methylenedioxymethamphetamine) with intent to deliver. *See* WIS. STAT. § 961.41(1m)(hm)1. His sole claim on appeal is that the circuit court erred in not granting his motion to suppress.[1] We reverse.

## I.

¶ 2. There are no disputed facts material to this appeal. The only person to testify was the police officer, Amy Bartol, who discovered the drug following her search of the van Sutton was driving after she and her partner stopped him for not wearing a seat belt. The circuit court's findings of fact tracked her testimony. The lawfulness of the stop is not at issue on this appeal.

---

[1] A person may appeal an order denying a motion to suppress even though that person has pled guilty. WIS. STAT. § 971.31(10).

341

¶ 3.   Officer Bartol said that when they stopped Sutton, at around 5 p.m. in late April of 2010, he was driving a large conversion van, and that he was alone. She testified that she walked to the driver's side and asked Sutton for his license and registration, which he gave her. She also testified that it was her routine practice to ask persons she stops if they were on either probation or parole. She asked Sutton that question, and he replied that "he thought" that he was on probation for possessing marijuana. He refused, however, to tell her where he had come from, saying that it was none of her business. This, of course, was his right. *See Florida v. Royer*, 460 U.S. 491, 497–498 (1983) (Although an officer may ask, a person "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.").

¶ 4.   After getting Sutton's license and registration, Officer Bartol and her partner returned to their squad car, which was parked some fifteen to twenty feet behind Sutton's van. As her partner checked Sutton's documents, Officer Bartol watched the van. She explained that this was a normal "safety" procedure:   "one person runs the information while the other one keeps a direct eye on the vehicle and all occupants in the vehicle." She could not see through the van's back windows, however, because they were small and tinted. Thus, she said that she could not "see Mr. Sutton from where I was seated." She did, however, see the van make "two distinct rocking motions, north and south." She told the circuit court why this concerned her:   "Due to my training and experience I know this movement to be a, one of someone who may be trying to retrieve or conceal a weapon. This caused me to fear for my safety and my partner's safety."

¶ 5.   The officers then returned to the van and did a quick pat-down search of Sutton for weapons. He was

not armed. "I then informed Mr. Sutton that I observed his vehicle make two distinct motions and it caused me to fear for my safety, my partner's safety, to believe he may try to retrieve a weapon." They put Sutton in the back of their squad car, "unhandcuffed." Officer Bartol's partner stayed with Sutton while, as she told the circuit court, she "started a search of the vehicle, starting with the driver's side where he was seated." Inside the driver's side "hard plastic" "map pocket" she "saw two dark blue vials on a single key chain." They were cylindrical and opaque. She opened the vials and saw pills of "various shapes, designs and colors." There were twenty-one pills and she believed that they were Ecstasy, which was later confirmed. Those are the pills that underlie Sutton's conviction and whose suppression he sought.

## II.

¶ 6. As noted, the facts here are not contested. Our review of the circuit court's legal conclusion upholding the search is *de novo*. *See State v. Harris*, 206 Wis. 2d 243, 250, 557 N.W.2d 245, 248 (1996).

¶ 7. Whether a law-enforcement officer may "conduct a protective search" of a car is "decide[d] on a case-by-case basis, evaluating the totality of the circumstances, whether an officer had reasonable suspicion to justify a protective search in a particular case." *State v. Buchanan*, 2011 WI 49, ¶ 9, 334 Wis. 2d 379, 389, 799 N.W.2d 775, 780 (quotation marks and quoted source omitted). "[R]easonable suspicion" is a "commonsense" concept that implicates "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United*

343

*States*, 517 U.S. 690, 695 (1996) (quotation marks and quoted sources omitted). Thus, there must be a balance between danger and privacy, and when law-enforcement officers make a traffic stop, the danger is significant. *See Buchanan*, 2011 WI 49, ¶ 18, 334 Wis. 2d at 395–396, 799 N.W.2d at 784 ("As we have frequently noted, traffic stops are dangerous for law enforcement, and permitting a limited search is a reasonable way to balance the competing interests involved."); *State v. Denk*, 2008 WI 130, ¶ 36, 315 Wis. 2d 5, 19, 758 N.W.2d 775, 782 ("Warrantless searches are presumed to be unconstitutional. Our jurisprudence has established several exceptions to this constitutional rule, based on a balance between the intrusion on the individual's Fourth Amendment interests and the government's promotion of its legitimate interests.") (internal citation omitted). We apply this analysis in assessing whether Officer Bartol violated Sutton's Fourth Amendment rights.

■

¶ 8.   Based on her testimony, Officer Bartol had a legitimate reason to be concerned that there might be a gun or other weapon in the van because it seems highly unusual, and did to Officer Bartol, for the large conversion van to make two, large and distinct "rocking motions" when the driver had just been stopped by a marked squad car, and asked by one of the officers about his probation or parole status. The minimal intrusion of looking into the van was more than outweighed by the need for the officers to assure themselves that there was no gun or other weapon in the van, *especially because Sutton was not under arrest and could freely return to the van. See State v. Williams*, 2010 WI App 39, 23, 323 Wis. 2d 460, 473, 781 N.W.2d 495, 502 (Officers had "an immediate safety interest in

344

verifying" that there was not a weapon in the car because a person stopped but not under arrest " 'will be allowed to return' " to the car.) (quoted source omitted). *Cf. Arizona v. Gant*, 556 U.S. 332, 351, 129 S. Ct. 1710, 1723 (2009) ("Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."); *State v. Smiter*, 2011 WI App 15, ¶ 18, 331 Wis. 2d 431, 439, 793 N.W.2d 920, 924 (Ct. App. 2010) (Police officers could search the interior of a car for evidence of the crime for which passenger was first arrested, even though the passenger could not have returned to the car.). Once Officer Bartol was lawfully looking in the van, she could also look at what was in plain sight— here, the opaque blue vials—without first getting a search warrant, but we agree that she should not have opened them.

¶ 9.    There are three prerequisites for application of the plain-view doctrine:

> (1) the evidence must be in plain view; (2) the officer must have a prior justification for being in the position from which she discovers the evidence in "plain view"; and (3) the evidence seized in itself or in itself with facts known to the officer at the time of the seizure, [must provide] probable cause to believe there is a connection between the evidence and criminal activity.

*Buchanan*, 2011 WI 49, ¶ 23, 334 Wis. 2d at 398–399, 799 N.W.2d at 785 (quotation marks and quoted sources omitted; brackets in *Buchanan*). Here, although the opaque cylinders were "in plain view," the pills were not. Moreover, Bartol could not tell by touch what was inside the cylinders without opening them. *See State v.*

*Applewhite*, 2008 WI App 138, ¶ 12, 314 Wis. 2d 179, 187, 758 N.W.2d 181, 184 ("plain feel"). *Cf. State v. Carroll*, 2010 WI 8, ¶¶ 24, 33, 322 Wis. 2d 299, 317, 322, 778 N.W.2d 1, 9, 12 (Scanning stored photographic images on a cell phone "without a warrant was improper" even though the incriminating character of at least the image the officer saw in plain view was apparent.). Additionally, as we explain below, Officer Bartol did not have probable cause to believe that the cylinders were connected to "criminal activity" until she opened them.

¶ 10.    "Probable cause" requires an assessment of "whether, under the totality of the circumstances, given all the facts and circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Sveum*, 2010 WI 92, ¶ 24, 328 Wis. 2d 369, 390–391, 787 N.W.2d 317, 327 (quotation marks and quoted sources omitted). This "is not a technical, legalistic concept but a flexible, common-sense measure of the plausibility of particular conclusions about human behavior." *Id.*, 2010 WI 92, ¶ 24, 328 Wis. 2d at 391, 787 N.W.2d at 328 (quotation marks and quoted sources omitted). Officer Bartol explained why she believed the opaque cylinders held illicit drugs:

- She had previously been involved "[b]etween five and six times" in the arrest of someone for having prescription drugs for which the person did not have a prescription.

- "The pills are generally transported in a clear orange with white cap prescription bottle containing no information on it or they are contained in a container in which people believe that police will not think is a prescription."

The cylinders here, however, were opaque, not clear, so Officer Bartol could not see what was inside, and thus, as noted, she did not have "plain view" of the pills. Further, her other experience—that pills can be transported "in a container in which people believe that police will not think is a prescription" applies to any opaque tube, box, carton, jug, can, urn, and the like. That is too slippery a criterion to permit the warrantless search of a container that could not, by its size or shape, hold a weapon. *Cf. Denk*, 2008 WI 130, ¶¶ 59–60, 315 Wis. 2d at 27–28, 758 N.W.2d at 786–787 (Officers could search inside of hard, opaque eyeglass case dropped by passenger because: (1) it could have held "a small weapon, such as a knife or a razor blade," and (2) it could also have held evidence of the crime for which the officers arrested the driver.). Further, Sutton was, as we have seen, entirely within his rights not to tell Officer Bartol where he had been, so his refusal to answer that question is not part of the probable-cause calculus.

¶ 11.   Officer Bartol did not have "probable cause to believe there [was] a connection between the [opaque cylinders] and criminal activity." *See Buchanan*, 2011 WI 49, ¶ 23, 334 Wis. 2d at 399, 799 N.W.2d at 785 (quotation marks and quoted sources omitted). She thus had to get a search warrant, if she could, before she opened them. Accordingly, we reverse.[2]

---

[2] The circuit court relied on *State v. Pallone*, 2000 WI 77, 236 Wis. 2d 162, 613 N.W.2d 568, which was overruled prospectively by *State v. Dearborn*, 2010 WI 84, ¶¶ 27, 50, 327 Wis. 2d 252, 267–268, 277–278, 786 N.W.2d 97, 105, 110, some three weeks after the circuit court held the suppression hearing and denied Sutton's motion. The State, however, does not argue that *Pallone* is applicable, and we agree that it is not because the officers in *Pallone* had probable cause to believe that the

*By the Court.*—Judgment reversed.

passenger's duffle bag held evidence material to the crime for which the driver was first arrested. *See Pallone*, 2000 WI 77, ¶ 54, 236 Wis. 2d at 188, 613 N.W.2d at 581. That is not the situation here.