STATE of Wisconsin, Plaintiff-Respondent,

v.

Royce Markel WHEELER, Defendant-Appellant.†

Court of Appeals

*No. 2012AP1291–CR. Submitted on briefs January 29, 2013.
—Decided March 19, 2013.*

2013 WI App 53

(Also reported in 830 N.W.2d 278.)

† Petition Review Filed.

426

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Craig S. Powell* of *Kohler & Hart, S.C.*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *David H. Perlman*, assistant attorney general.

Before Fine, Kessler and Brennan, JJ.

¶ 1. KESSLER, J. Royce Markel Wheeler appeals the judgment of conviction, entered on March 6, 2012,

convicting him of possession of cocaine with intent to deliver, and possession of a firearm by a felon. Wheeler challenges the trial court order denying his motion to suppress evidence. We affirm.

## BACKGROUND

¶ 2. On May 21, 2011, Wheeler was charged with one count of possession of over forty grams of cocaine with the intent to deliver and one count of being a felon in possession of a firearm, as a repeat offender. The charges in the criminal complaint were based upon items discovered by police during a search of Wheeler's apartment, including a cable bill and a Western Union receipt, which identified Wheeler as the occupant of a duplex on 5424 North Long Island Drive, Milwaukee. Police were dispatched to the location, a two-story duplex, in response to a 9-1-1 call reporting a domestic disturbance. A subsequent police search of the upper unit revealed cocaine, a firearm, and documents identifying Wheeler as the occupant of the upper unit.

¶ 3. Wheeler filed a motion to suppress evidence, arguing that the items seized from his apartment— namely, the cocaine and the firearm—were seized as a result of an illegal search. The details of the search, and Wheeler's subsequent arrest, were addressed at a hearing on Wheeler's motion.

¶ 4. According to police testimony from the suppression hearing, Milwaukee police were dispatched to the Long Island Drive duplex on May 19, 2011, in response to a 9-1-1 call from a woman identifying herself as Sherry Rivers. Rivers told the 9-1-1 operator that she had been assaulted by the father of her child, that she was bleeding, and that her attacker fled the scene.

431

¶ 5. Sergeant Kerry Flowers testified that he was the first officer to arrive at the duplex. Flowers believed that the call came from the lower unit. Flowers knocked on the common front door—shared by both the upper and lower units—the back door, the side doors and the lower unit windows, but did not receive a response. Officer Rufaro Davis, who was also dispatched to the location, arrived shortly after Flowers. Flowers told Davis that no one was responding to his knocks. Davis then also knocked on the front and side doors. After noticing an open second-floor window, Davis began to yell loudly, telling whoever was in the upper unit to open the door.

¶ 6. According to Flowers, the officers knocked and yelled for a combined total of approximately twenty minutes before a woman, who identified herself as "Sasha Banks," ("Bates")[1] opened the common door. The police told Bates that they were investigating a domestic violence call related to the lower unit. Bates told police that she lived in the upper unit and knew nothing about a domestic disturbance in the lower unit. Flowers explained to Bates that in domestic violence-related situations, people prefer to hide from police and that he (Flowers) would like to search the basement area of the duplex to look for anyone "who may be injured or hurt." Bates consented to the search. Police did not find anything in the basement.

¶ 7. After searching the basement, Flowers asked Bates if Bates had "control" over the upper unit of the duplex, to which Bates responded in the affirmative and

---

[1] Although Davis initially testified that the woman who opened the common door identified herself as "Sasha Banks," we refer to her as "Bates" because the criminal complaint, testimony from Flowers, and subsequent testimony from Davis, refer to the woman as having the last name of "Bates."

stated that she lived in the upper unit alone. Flowers asked Bates for permission to search the upper unit, to which Bates said something to the effect of " 'I have no problem with that.' " Police obtained Bates's consent in writing, at which time Bates told police that her boy-friend "Kev" may be in the upper unit. Flowers stated that as he began to proceed up the stairs to the upper unit, a man—later identified as Willie Whitmore—exited the upper unit. Other officers on the scene detained Whitmore for questioning and Flowers asked Bates whether anyone else was in the upper unit. Bates did not respond. Before Flowers reached the door of the upper unit, another man—who identified himself as Wheeler—exited the upper unit. Other officers on the scene detained Bates, Whitmore and Wheeler while Flowers and Davis searched the upper unit.

¶ 8. Davis also testified at the suppression hear-ing. Consistent with Flowers's testimony, Davis stated that Bates consented to a search of the basement after police told Bates that they were looking for someone connected to the domestic violence call who could be hurt and/or hiding. Davis stated that Bates also offered to try to contact the landlord of the duplex so that police could access the lower unit. Bates pulled out her cellular phone and appeared to make a phone call, but was speaking too quietly for Davis to hear her conver-sation.

¶ 9. Davis also testified that she saw both Whit-more and Wheeler exit the upper unit after Bates had stated that no one was up there. Pursuant to Bates's consent, Davis and Flowers searched the upper unit. While in the upper unit, Davis noticed an access panel on the ceiling in one of the hallways. Davis described the panel as: (1) approximately one and one half feet long by one and one half feet wide; (2) accessible only by

433

unlatching and unhooking the panel from the inside of the upper unit; and (3) leading to an attic that appeared large enough to fit a body. Davis stood on a chair, unhooked and unlatched the access panel with a baton, and proceeded into the attic. Once inside, Davis noticed a partially-open potato chip bag. Davis picked up the bag and saw a white substance—later positively identified as cocaine—inside the bag. Davis also located a firearm in the attic.

¶ 10. The officers further testified that Bates, Whitmore, and Wheeler were all arrested. Davis stated that after Bates's arrest, she told Davis that she did not really reside at the duplex, but rather, was asked by Wheeler to lie and say that she did. Specifically, Bates told Davis that Wheeler asked her (Bates) to tell police that she lived in the upper unit and that nobody else was up there.

¶ 11. The trial court denied Wheeler's motion to suppress evidence of the cocaine and firearm, finding that under the totality of the circumstances, the police reasonably believed that Bates had authority to consent to the warrantless search. The trial court also found that because Bates did not limit the scope of the search, police had consent to open the access panel and search the attic area. Further, the trial court found that because Davis "visually saw" the potato chip bag and "didn't open anything up," the cocaine found inside of the bag was admissible.

¶ 12. Wheeler pled guilty[2] to both counts and was sentenced to nine years' imprisonment on each count,

---

[2] In most instances, a defendant who pleads guilty waives all nonjurisdictional defects and defenses. *See County of Racine v. Smith*, 122 Wis. 2d 431, 434, 362 N.W.2d 439 (Ct. App. 1984). However, Wis. Stat. § 971.31(10) (2011–12) makes an exception to this rule, which allows appellate review of an order denying

consisting of five years' initial confinement and four years' extended supervision on each count. This appeal follows.

## DISCUSSION

¶ 13. On appeal, Wheeler argues that: (1) police unreasonably relied on Bates's consent to search his apartment because police did not adequately inquire about Bates's authority over the upper unit; (2) even if Bates's consent to enter the duplex was reasonable, police exceeded the scope of the consent by searching the attic space; and (3) the search and seizure of the potato chip bag was beyond the scope of the search. We address each argument.

## A. Standard of Review.

■■

¶ 14. In reviewing a trial court's ruling on a motion to suppress evidence, we will uphold the trial court's findings of historical fact unless they are clearly erroneous. *State v. Arias*, 2008 WI 84, ¶ 12, 311 Wis. 2d 358, 752 N.W.2d 748. However, whether police conduct violated the constitutional guarantee against unreasonable searches and seizures is a question of constitu-

a motion to suppress evidence, notwithstanding a guilty plea. *Smith*, 122 Wis. 2d at 434–35.

The State moved to strike the repeater allegations in the information. Wheeler subsequently pled guilty to one count of possession of cocaine with the intent to deliver and one count of being a felon in possession of a firearm.

All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

tional fact that we review independently. *See id.*, ¶ 11. "Whether a search or seizure has occurred—and if so, whether it passes constitutional muster—are questions of law, subject to independent review." *State v. Guard*, 2012 WI App 8, ¶ 14, 338 Wis. 2d 385, 808 N.W.2d 718. " 'The Fourth Amendment to the United States Constitution and article I, section eleven of the Wisconsin Constitution both protect citizens from unreasonable searches.' " *Id.* (citation omitted).

■■■■■■

¶ 15. "While, as a general rule, a warrantless search is per se unreasonable under the Fourth Amendment, there are exceptions." *State v. St. Germaine*, 2007 WI App 214, ¶ 15, 305 Wis. 2d 511, 740 N.W.2d 148. "One such exception is valid third-party consent from one who has common authority over the premises involved." *Id.* "The State bears the burden of proving by a preponderance of the evidence that the search and seizure falls within the third-party consent exception." *Id.*, ¶ 16.

**B. Bates's Authority to Consent.**

■■■■

¶ 16. It is undisputed that Bates did not actually reside in the upper unit of the duplex and did not actually possess the authority to grant consent to a police search. However, the United States Supreme Court, in *Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990), expanded the third-party consent exception to include situations where a warrantless entry is based upon the consent of a third party *reasonably believed* by the police, at the time of the entry, to possess apparent common authority over the premises, but who in fact does not. A determination as to whether reliance is

reasonable under such circumstances is measured by the following objective standard:

> [W]ould the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises? If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*Id.* (quoted sources, internal citations and quotation marks omitted; ellipses in *Rodriguez*).

¶ 17. Wheeler contends that there was no reasonable basis for police to rely on the consent they obtained from Bates because the officers knew that Bates had repeatedly lied about whether anyone was in the upper unit and therefore should have made efforts to determine whether Bates actually did have authority to consent to the search. Wheeler relies on *State v. Kieffer*, 217 Wis. 2d 531, 577 N.W.2d 352 (1998), and our recent decision in *Guard* to support his position. Neither of these two cases compel the result that Wheeler seeks.

¶ 18. In *Kieffer*, the Wisconsin Supreme Court discussed whether a father-in-law had apparent authority to consent to the search of his daughter's and son-in-law's living space, owned by the father-in-law. *Id.*, 217 Wis. 2d at 547–55. Police went to the father-in-law's home and told him that they suspected drugs were present in the loft area above the father-in-law's garage. *Id.* at 534–35. The father-in-law subsequently consented to the search and led police to the loft area, stating ' "he didn't want any drugs on his property.' " *Id.* at 535. Once inside the loft area, police found psilocybin mushrooms. *Id.* at 538. The supreme court determined that the police did not ask enough questions to determine whether the father-in-law's ownership in the

property outweighed the defendant's and his wife's privacy interests in their living space. *Id.* at 550–51. The supreme court determined that the defendant and his wife had established a separate household. *Id.* at 546.

█

¶ 19. Unlike the circumstances in *Kieffer*, the police in this case did not attempt to obtain consent from a third-party property owner. Rather, they attempted to obtain consent from a person claiming to reside in the unit. Although Bates did indeed lie about her residency and whether anyone was in the unit, her actions did not indicate that she lacked the authority to consent to a search of the unit. According to testimony from the suppression hearing, Bates came down the stairs leading from the upper unit to the common door to make contact with the police. She expressly told police that she lived in and controlled the upper unit. When asked about the domestic violence call associated with the lower unit, Bates offered to contact the landlord, pulled out her cellular phone, and acted as though she was making the phone call. The presence of other individuals did not necessarily vitiate Bates's clear assertions—through her words and actions—that she lived in the upper unit.

¶ 20. We also conclude that this case is distinguishable from the facts asserted in *Guard*. In *Guard*, police officers responded to a dispatch about possible armed drug dealing at a Milwaukee duplex. *Id.*, 338 Wis. 2d 385, ¶ 2. When officers arrived at the duplex, they saw two women sitting on the front porch with the front door open behind them. *Id.*, ¶ 2. The officers asked the women whether someone named "Anthony" was at the duplex. *Id.* One of the women told the officers that they would " 'probably want the back

door,'" and pointed the officers in the direction of the back door. *Id.* One of the women sitting on the porch told the officers that she lived in the duplex, but the record was unclear as to which woman directed the officers to the back door—the only entrance to the upper unit of the duplex. *Id.*, ¶¶ 2, 18. The officers also admitted to having no further discussion with either of the women after being directed to the back door. *Id.*, ¶ 25. We held that the officers did not make a sufficient inquiry as to any authority either of the women may have had over the back door area. *Id.*, ¶¶ 25–27. Indeed, the officers did not even ask the women their names and could not recall whether the woman who granted consent was the one who claimed to reside in the duplex. *Id.*, ¶ 25.

██

¶ 21. Unlike the circumstances in *Guard*, Bates established a relationship to the upper unit. Although we recognize that "'officers may not always take [a person's] consent to a search at face value,'" they "'must consider the surrounding circumstances.'" *State v. Tomlinson*, 2002 WI 91, ¶ 25, 254 Wis. 2d 502, 648 N.W.2d 367 (citation omitted). The circumstances surrounding police in this instant case are the following: (1) Bates came down the staircase between the upper unit and the common entrance and opened the door for the police, a seemingly clear indication that she lived in the upper unit; (2) Bates identified herself; (3) Bates expressly stated that she lived in the upper unit; (4) Bates granted consent to search both verbally and in writing; and (5) Bates acted as though she had access to the landlord by pretending to call him or her.

¶ 22. Moreover, the record demonstrates that Wheeler *wanted* police to believe that Bates had authority over the upper unit. It is undisputed that Wheeler

instructed Bates to lie to police and claim that she lived in the upper unit. To argue now that police wrongly relied on Bates's authority, when Wheeler orchestrated the attempt to mislead police, is disingenuous.

¶ 23. Based on the totality of the circumstances, we conclude that Bates had apparent authority to consent to the warrantless search of the upper unit and that the police were reasonable in reaching the same conclusion.

### C. The Search of the Attic Area.

¶ 24. Wheeler also contends that even if police did have authority to search the upper unit, the authority was limited to "checking the apartment's living area for people," and therefore did not extend to the attic area. As such, Wheeler argues, the gun and cocaine were discovered pursuant to a search beyond the scope of what was reasonably authorized.

¶ 25. A search conducted with consent is "constitutionally reasonable to the extent that the search remains within the scope of the actual consent." *See State v. Rogers*, 148 Wis. 2d 243, 248, 435 N.W.2d 275 (Ct. App. 1988). " 'The standard for measuring the scope of [a person's] consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?' " *State v. Kelley*, 2005 WI App 199, ¶ 13, 285 Wis. 2d 756, 704 N.W.2d 377 (citation omitted). "The scope of a search is generally defined by its expressed object. The police are permitted to search where the objects sought can be found." *Id.* (quoted source, internal citation, and one set of quotation marks omitted). A party may delineate as

he chooses the scope of the search to which he consents. *Florida v. Jimeno*, 500 U.S. 248, 252 (1991).

¶ 26. Based on the testimony of the officers at the suppression hearing, the trial court found that Bates did not limit the scope of the officers' search. Police told Bates that they were responding to a domestic violence call and were looking for people who may have been involved in the incident, specifically, anyone who may be injured and/or hiding. Bates consented, simply saying something to the effect of "I have no problem with that." At no point did Bates attempt to limit the scope of the consent by telling officers to avoid the attic space. At no point did Bates attempt to add a written limitation to her written consent. Given the facts that: (1) Bates did not object to the officers' search of the attic area, (2) police were looking for injured parties in relation to a domestic violence call who may have been hiding, and (3) the attic area was large enough for a person to hide, we conclude that the police did not exceed the scope of Bates's consent when they searched in the attic area and retrieved cocaine and a firearm.

### D. Plain View Doctrine.

¶ 27. Finally, Wheeler contends that once inside the attic area, police again extended the scope of their consent by retrieving the cocaine-filled potato chip bag. "An officer has the right to access objects in plain view while searching within the scope of the consent." *Kelley*, 285 Wis. 2d 756, ¶ 15. Application of the plain view doctrine requires the following:

> First, the evidence must be in plain view. Second, the police officer must have a lawful right of access to the

441

object. Third, the incriminating character of the object must be immediately apparent, meaning the police must show they had probable cause to believe the object was evidence or contraband.

*Id.* (citation omitted).

¶ 28. All three elements are satisfied in this case. First, the officers visibly saw, in plain view, a potato chip bag after entering the attic. The bag was already open. By simply obtaining the bag and looking inside, the officers did not violate the scope of their consent. Second, having a right to be in the attic, the officers had a lawful right of access to the bag. The potato chip bag was in plain view and was open. Upon looking inside of the already-open bag, the officers discovered a chunky, white substance. Based on their experiences, the officers reasonably suspected the substance to be cocaine. We conclude, therefore, that the open potato chip bag, and in turn, the cocaine found inside, were within the officers' plain view.

¶ 29. The record is unclear as to where in the attic the gun was found, however, there is no contention that the gun was hidden. We have already concluded that the officers did not exceed the scope of their consent by searching the attic area. Therefore, no error occurred when the officers recovered the gun from the attic as well.

¶ 30. For the forgoing reasons, we affirm the trial court.

*By the Court.*—Judgment affirmed.

¶ 31. FINE, J. (*concurring/dissenting*). I join in all of the Majority's opinion except its conclusion that Officer Rufaro Davis's search of the potato-chip bag did not exceed the scope of the consensual search.

¶ 32. As the Majority tells us, the officers got consent to search for a person—either a victim or a perpetrator of domestic abuse. Thus, as the Majority also tells us, the officers properly searched places where a person could be either secreted or hiding, and I agree with the Majority that this included the attic. The Majority errs in my view when it holds that the officer could look inside the potato-chip bag, which, as the Majority notes, was prelude to the officer's discovery of the cocaine.

¶ 33. The Majority writes:

> First, the officers visibly saw, in plain view, a potato chip bag after entering the attic. The bag was already open. By simply obtaining the bag and looking inside, the officers did not violate the scope of their consent. Second, having a right to be in the attic, the officers had a lawful right of access to the bag. The potato chip bag was in plain view and was open. Upon looking inside of the already-open bag, the officers discovered a chunky, white substance. Based on their experiences, the officers reasonably suspected the substance to be cocaine. We conclude, therefore, that the open potato chip bag, and in turn, the cocaine found inside, were within the officers' plain view.

Majority, ¶ 28. Of course, only the potato-chip bag was in "plain view"; the cocaine inside the bag was not. Under controlling Fourth-Amendment law as set out in *Arizona v. Hicks*, 480 U.S. 321 (1987), looking inside the bag was a no-no because the officers were searching for persons, not contraband, and they had no reason to look inside the bag.

¶ 34. In *Hicks*, officers lawfully entered an apartment from which gunshots were fired. Id., 480 U.S. at 323. Once in the apartment, the officers saw in plain view expensive audio equipment that they suspected

might have been stolen. *Ibid.* The serial numbers were not, however, in plain view, and the officers moved the equipment several inches in order to copy those numbers. *Id.*, 480 U.S. at 323, 325. This was unlawful because before the officers saw those serial numbers, they did not have probable cause to believe that the equipment was stolen. Id., 480 U.S. at 324–329. Stated another way, the audio equipment's status was not in plain view, and moving them without having first gotten a warrant violated the Fourth Amendment. Id., 480 U.S. at 325 (noting that warrantless searches are " 'strictly circumscribed' " by the scope of the circumstances permitting a search without a warrant) (quoted source omitted).

¶ 35. Here, the scope of the consent was for persons, not contraband. Unless, the persons for whom the officers had consent to search were even smaller than the Lilliputians, perhaps the size of the family about whom "The Littles" was written, there was no possibility that they were in the potato-chip bag.[1]

¶ 36. In sum, as in *Hicks*, the contraband here (the cocaine, not the gun) was not in plain view—it was in the potato-chip bag. *See also State v. Sutton*, 2012 WI App 7, ¶ 9, 338 Wis. 2d 338, 345–348, 808 N.W.2d 411, 415–416 (Ct. App. 2011) (closed opaque container). Thus, unlike *State v. Kelley*, 2005 WI App 199, 285 Wis. 2d 756, 704 N.W.2d 377, upon which the Majority relies, where the officers searched within the scope of the consent because the evidence for which they were looking was capable of being hidden where they looked, *id.*, 2005 WI App 199, ¶ 14, 285 Wis. 2d at 764, 704 N.W.2d at 381 ("Here, the police were searching for a telephone handset and an accelerant. Certainly, either

---

[1] *See* JOHN PETERSON, THE LITTLES (Scholastic, Inc. 1967).

object could be easily hidden beneath a bed."), the persons for whom the officers were looking could not have been in the potato-chip bag.

¶ 37. Whether *Hicks* was right or wrong, it is the law and we must follow it. *See Hutto v. Davis*, 454 U.S. 370, 374–375 (1982) (per curiam). Accordingly, I respectfully dissent from the Majority's affirmance of the trial court's refusal to suppress the cocaine discovered in the potato-chip bag.