COURT OF APPEALS
DECISION
DATED AND FILED

August 20, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2412-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2020CF536

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

PABLO D. BEYER,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Waukesha County: LAURA F. LAU, Judge. *Affirmed*.

Before Neubauer, P.J., Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Pablo D. Beyer appeals from a judgment of conviction entered after he pled guilty to three counts of possession of child pornography. Beyer argues the circuit court erred in denying his motion to suppress evidence found by the police during a warrantless search of his brother's apartment. He contends that he did not voluntarily consent to the search, that the search was not justified under any other exception to the warrant requirement, and that even if he had consented, the search exceeded the scope of the consent he gave. In response, the State argues that Beyer lacks standing to challenge the search, but even if he does have standing, the search did not violate Beyer's constitutional rights.

¶2 Assuming without deciding that Beyer has standing to object to the search, we conclude that the search of the apartment and seizure of electronic devices found therein, some of which were later determined to contain child pornography, did not violate Beyer's rights under the federal and Wisconsin constitutions. Beyer has not shown that the circuit court erred in concluding that he voluntarily consented to the search of the apartment. In addition, the police lawfully seized the electronic devices in the apartment because they were in plain view in an area of the apartment where the police were authorized to conduct the search. For these reasons, the court did not err in denying Beyer's motion to suppress, and we affirm the judgment.

## BACKGROUND

¶3 The circuit court held a hearing on Beyer's motion to suppress at which Beyer and the two officers who arrested him and searched the apartment testified. The testimony revealed the following facts. On the evening of December 21, 2019, Waukesha Police Officer Andrew McNulty responded to a

2

hit-and-run between a motor vehicle and a pedestrian at the Walmart in Waukesha. The vehicle involved was a black Honda Civic, which McNulty linked to Beyer. Through his research into Beyer's background, McNulty learned that Beyer was on extended supervision in connection with a prior conviction for possession of child pornography and was not supposed to possess any electronics.

¶4 After identifying Beyer as the suspect, McNulty went to his residence in Waukesha, but he was not home. In speaking with management at the building, McNulty learned that Beyer's brother, Jose, was paying Beyer's rent. McNulty also learned that Jose lived at a different address near the Walmart where the hit-and-run had occurred.

¶5 McNulty went to Jose's address around 5:00 p.m. on December 24 to determine if he had been in contact with his brother. Upon arrival, McNulty testified, he observed a black Honda Civic that had damage consistent with the vehicle that had been involved in the hit-and-run. McNulty photographed the vehicle and identified Jose as the registered owner.

¶6 After requesting backup, McNulty knocked on the door to Jose's apartment. Beyer answered, and McNulty asked him to step into the hallway to speak about the hit-and-run accident. McNulty testified that he had Beyer, who was not wearing shoes or socks, sit on the stairs near the front door of the apartment for their conversation. Soon after they began speaking, a second officer, Ryan Solberg, arrived at the scene. McNulty, who at this point intended to arrest Beyer in connection with the hit-and-run, testified that he asked Beyer if "Solberg could go inside his apartment to grab [Beyer's] shoes and keys to lock the apartment." According to McNulty, Beyer said, "Yes." McNulty denied acting in a threatening, coercive, or intimidating manner during this exchange.

3

¶7     Solberg entered the apartment but, according to McNulty, could not find the shoes or keys. He returned to the hallway, and McNulty asked Beyer if all three men could enter the apartment to find them. McNulty testified that Beyer again said yes. McNulty testified further that once the three men were inside the apartment, he observed multiple electronic devices, including a large television, two laptops, cell phones, and USB drives. Beyer confirmed that the devices belonged to him and, according to McNulty, acknowledged that he was "[p]robably not" supposed to have them. McNulty testified that he asked Beyer if he would allow the officers to search the devices, and Beyer agreed. McNulty again denied threatening or intimidating Beyer during their conversation. He testified that Beyer signed a form giving the officers consent to search the devices.

¶8     On cross-examination, McNulty testified that he was dressed in his police uniform with his gun holstered when he knocked on the door to Jose's apartment. He did not recall taking his gun out of the holster during his interaction with Beyer. He also testified that before Solberg entered the apartment, "there was a conversation about where [he] could locate" Beyer's shoes and keys, though he did not recall where in the apartment Beyer said they were. Once the three men entered the apartment, McNulty did not see the electronic devices until they had walked down a hallway and entered the living room.

¶9     Solberg also testified about his search of the apartment. He confirmed that he met McNulty and Beyer outside the apartment, knowing that McNulty was there to follow up with Beyer about the hit-and-run accident. Solberg testified that McNulty asked Beyer if he had any shoes or belongings he wished to bring with him; when Beyer said he wanted shoes and keys, McNulty asked Beyer if Solberg could go inside the residence to retrieve them for him.

Solberg confirmed that Beyer agreed to allow him to enter the apartment without any threats, coercion, intimidation, or promises.

¶10    Solberg testified that he located Beyer's shoes in the hallway just inside the entrance.  He described a small living room at the end of the hallway, "where the TV was," and a desk or table near the hallway where he looked for the keys.  After locating Beyer's shoes, Solberg told McNulty and Beyer that he could not find the keys.  Solberg testified that McNulty then asked Beyer if they all could go into the apartment and look for them, and that Beyer said yes.  Solberg confirmed this interaction took place without threats or promises.

¶11    Beyer was the last witness to testify.  He denied that McNulty ever asked him if Solberg could enter his brother's apartment.  He testified that Solberg entered the apartment without Beyer's permission while Beyer and McNulty were speaking in the hallway.  Beyer also claimed that Solberg returned to the hallway with Beyer's mother's shoes, at which point Beyer told him that his shoes "were under the TV."  But Beyer denied telling Solberg to retrieve his shoes.  In Beyer's account, Solberg then went back into the apartment, again by himself, and returned with Beyer's shoes.  At that point, according to Beyer, Solberg asked about his keys and wallet.  After Beyer told Solberg where he thought those items were in the apartment, McNulty told Beyer to move into the apartment.

¶12    Beyer's testimony about the search for his belongings was not entirely consistent.  On direct examination, Beyer denied asking the officers to retrieve his shoes and keys; he claimed that once the three men were in the apartment, Beyer asked for a sweater, but McNulty "told [him] that [he] didn't need a sweater, that it wasn't cold outside."  When cross-examined, however, Beyer acknowledged that he gave Solberg permission to retrieve his wallet and

5

keys from the apartment. Then on redirect examination, Beyer agreed that he had never asked either officer "to go inside and get any of [his] belongings."

¶13 The police searched the devices taken from Jose's apartment and discovered images of child pornography on one of the USB drives. The State charged Beyer with ten counts of possession of child pornography. Beyer then filed a motion to suppress all evidence obtained from the entry into Jose's apartment.

¶14 In an oral ruling following the suppression hearing, the circuit court denied Beyer's motion. The court recognized that the parties had presented "some contradictory testimony between [Beyer] and the two officers" and "[found] the officers' testimony to be more credible, especially in light of the consent to search [the electronic devices] that was signed by Mr. Beyer." Based on the officers' testimony, the court concluded that Beyer "provided knowing and voluntary consent to Officers McNulty and Solberg to enter Mr. Beyer's brother's apartment and that Mr. Beyer did not have a reasonable expectation of privacy to his brother's apartment." Beyer subsequently pled guilty to three counts of possession of child pornography.

## DISCUSSION

¶15 We review the circuit court's denial of Beyer's suppression motion under a two-step standard of review. *See **State v. Anderson**,* 2019 WI 97, ¶19, 389 Wis. 2d 106, 935 N.W.2d 285. First, we will uphold the court's factual findings unless they are clearly erroneous. *See **State v. Eason**,* 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625. "A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." ***Anderson**,* 389

Wis. 2d 106, ¶20. Next, "we review the application of constitutional principles to those facts *de novo.*" *Eason*, 245 Wis. 2d 206, ¶9.

## I. Voluntary Consent

¶16 The Fourth Amendment to the United States Constitution and article I, section 11 of the Wisconsin Constitution protect persons against "unreasonable searches and seizures" by the government. U.S. CONST. amend. IV; WIS. CONST. art. I, § 11.[1] Warrantless searches are per se unreasonable and thus violate these constitutional protections unless an established exception to the warrant requirement applies. *State v. Foster*, 2014 WI 131, ¶32, 360 Wis. 2d 12, 856 N.W.2d 847. One of these well-established exceptions is a search conducted pursuant to consent. *State v. Artic*, 2010 WI 83, ¶29, 327 Wis. 2d 392, 786 N.W.2d 430. "The consent exception is premised on the notion that it is reasonable for police to conduct a search if they have been permitted to do so by the person whose expectation of privacy is implicated." *State v. Jereczek*, 2021 WI App 30, ¶17, 398 Wis. 2d 226, 961 N.W.2d 70. To determine whether this exception applies, we must assess "whether consent was given in fact" and, if so, "whether the consent given was voluntary." *Artic*, 327 Wis. 2d 392, ¶30.

¶17 Before considering the applicability of this exception to the facts before us, we briefly address the circuit court's determination that Beyer did not have a reasonable expectation of privacy in his brother's apartment. The existence of such an expectation is germane to the concept of standing: a person who does

---

[1] Wisconsin courts "normally interpret [a]rticle I, § 11 consistent with the United States Supreme Court's interpretation of the Fourth Amendment." *State v. Coffee*, 2020 WI 53, ¶21 n.5, 391 Wis. 2d 831, 943 N.W.2d 845.

not have an expectation of privacy in a place that is searched lacks standing to challenge the lawfulness of the search. *State v. Bruski*, 2007 WI 25, ¶22, 299 Wis. 2d 177, 727 N.W.2d 503. Although the parties have briefed this issue, we need not resolve it because even if we assume that Beyer had standing to challenge the search, we agree with the circuit court that the search did not violate his constitutional rights. *See Staver v. Milwaukee County*, 2006 WI App 33, ¶20, 289 Wis. 2d 675, 712 N.W.2d 387 (only dispositive issues need be addressed).

¶18 To determine if the consent exception is satisfied, we first consider whether Beyer gave consent through his "words, gestures, or conduct." *See Artic*, 327 Wis. 2d 392, ¶30. Whether Beyer gave consent is a question of fact. *See id.* The circuit court found that Beyer consented to McNulty and Solberg entering his brother's apartment based on its determination that the officers' testimony was more credible than Beyer's, particularly "in light of the consent to search" form that Beyer signed. Beyer argues that the court "provided no analysis or support for its finding" that the officers' testimony was more credible.

¶19 We do not agree; the circuit court specifically mentioned the fact that Beyer signed a form giving the officers consent to search the electronic devices found in his brother's apartment as support for its determination that the officers' account was more credible. The court evidently believed that Beyer's conferral of consent to search the devices made their testimony that they had obtained Beyer's consent to enter the apartment more credible. This was a reasonable conclusion for the court to reach. Moreover, because the court acted as the factfinder, it "is the ultimate and final arbiter of the credibility of witnesses, and we must accept [its] credibility determination" unless "it is 'inherently or patently incredible,' or 'in conflict with the uniform course of nature or with fully established or conceded facts.'" *See Nicholas C.L. v. Julie R.L.*, 2006 WI App

8

119, ¶23, 293 Wis. 2d 819, 719 N.W.2d 508 (quoting *Chapman v. State*, 69 Wis. 2d 581, 583, 230 N.W.2d 824 (1975)).  Beyer's argument falls short of satisfying this high bar.

¶20   Because Beyer has not established a basis to set aside the circuit court's finding that he consented to the search of the apartment, we next consider whether Beyer's consent was voluntary.  *See Artic*, 327 Wis. 2d 392, ¶32.  The State bears the burden of proving voluntariness by clear and convincing evidence.  *Id.*  "The determination of 'voluntariness' is a mixed question of fact and law based upon an evaluation of 'the totality of all the surrounding circumstances.'"  *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

¶21   In assessing voluntariness, our analysis is guided by the following nonexclusive list of factors:

> (1) whether the police used deception, trickery, or misrepresentation in their dialogue with the defendant to persuade him to consent; (2) whether the police threatened or physically intimidated the defendant or "punished" him by the deprivation of something like food or sleep; (3) whether the conditions attending the request to search were congenial, non-threatening, and cooperative, or the opposite; (4) how the defendant responded to the request to search; (5) what characteristics the defendant had as to age, intelligence, education, physical and emotional condition, and prior experience with the police; and (6) whether the police informed the defendant that he could refuse consent.

*Artic*, 327 Wis. 2d 392, ¶33 (citation omitted); *see also State v. Phillips*, 218 Wis. 2d 180, 198-203, 577 N.W.2d 794 (1998).  Applying these factors here, we conclude that the State established by clear and convincing evidence that Beyer's consent to the officers' entry and search of the apartment was voluntary.

¶22   First, no evidence presented at the hearing suggested that McNulty and Solberg obtained Beyer's consent to enter the apartment through deception,

9

trickery, or misrepresentation. Nor was there evidence showing that the officers physically intimidated Beyer or threatened him to obtain his consent. McNulty and Solberg denied acting in a threatening or coercive manner towards Beyer, and McNulty did not recall unholstering his gun during their interaction. Even if we were not bound by the circuit court's determination that the officers testified credibly, Beyer did not identify any threatening or coercive behavior or statements in his testimony.

¶23 Next, the conditions surrounding Beyer's conversation with McNulty and Solberg appear to have been congenial and cooperative, not threatening. The officers spoke with Beyer at around 5:00 p.m., rather than late at night or early in the morning. Beyer initially spoke with McNulty while seated on a staircase in the hallway outside the apartment; the two men later moved into the apartment with Solberg after he was unable to find Beyer's keys. The conversation was aimed at locating Beyer's keys and shoes so that he could secure the apartment and leave with the officers. Nothing in the hearing transcript indicates that the officers spoke to Beyer in a disrespectful, antagonistic, or threatening manner. Beyer was not handcuffed or otherwise physically restrained, and though he was not wearing shoes initially, there is no indication he was cold or physically uncomfortable during the interaction.

¶24 In addition, according to the officers, Beyer promptly consented to the officers' requests to search the apartment and the devices they found. McNulty testified that Beyer agreed to McNulty's initial request to allow Solberg into the apartment and later agreed that both officers could enter the apartment when Solberg was unable to locate his keys. When McNulty discovered the electronics, Beyer acknowledged he was "[p]robably not" supposed to have them and gave both verbal and written consent to search them. Beyer's repeated

affirmations of consent weigh in favor of voluntariness. No credible evidence, much less a great weight and clear preponderance of evidence, suggests that Beyer initially refused consent or otherwise responded to the officers' requests in a manner that might support a contrary conclusion. *See Artic*, 327 Wis. 2d 392, ¶56 (noting that "[a]n initial refusal of a request to search will weigh against a finding of voluntariness").

¶25 With respect to Beyer's personal characteristics, the circuit court did not make any findings regarding his age, intelligence, education, physical and emotional condition, or prior experience with the police, but we know from the record that Beyer was 34 years old on the day of the search. In addition, testimony at the suppression hearing indicates that he could understand English and converse with the officers. Finally, Beyer had prior experience with law enforcement in connection with a prior conviction for possession of child pornography. On this record, we cannot conclude "that [Beyer] was particularly susceptible to improper influence, duress, intimidation, or trickery." *See Phillips*, 218 Wis. 2d at 202-03.

¶26 Beyer focuses on the final factor identified in *Artic* and contends that the officers never told him he could refuse to allow them to enter the apartment. He also notes that the officers did not give him the option of retrieving his shoes and keys by himself. These facts, he argues, made his consent involuntary because he did nothing more than "acquiescence to a claim of lawful authority." *See Artic*, 327 Wis. 2d 392, ¶32 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968)). We do not agree. A failure by the police to advise a suspect that he or she may refuse consent is one factor that weighs against voluntariness, but it "is not fatal to[] a determination of voluntary consent." *Phillips*, 218 Wis. 2d at 203. Here, all of the other factors support the conclusion that Beyer's

consent was voluntary. This final factor does not, by itself, tip the balance in the other direction.

¶27 Beyer also contends that a case deemed factually analogous by the circuit court, *State v. McCarty*, 47 Wis. 2d 781, 177 N.W.2d 810 (1970), is in fact materially distinguishable. *McCarty* involved a police entry into the defendant's hotel room to retrieve his belongings after he was detained for a parole violation, whereupon the police discovered evidence linking the defendant to a burglary. *Id.* at 784. Although the facts in *McCarty* are different in certain respects from those in the present case, Beyer has not explained how those differences are material to the issue of voluntariness or established that *McCarty* compels a different conclusion here. On balance, the totality of the circumstances leads us to conclude that the State established by clear and convincing evidence that Beyer voluntarily consented to the search of his brother's apartment.

## II. Scope of Consent

¶28 Beyer's other argument regarding the issue of consent is that, even according to the officers' testimony, he only permitted them to enter his apartment to retrieve his shoes and keys, which justified a search in the hallway area immediately inside the door. He argues that the officers exceeded the scope of this consent when they walked down the hallway and into the living room, where the electronic devices were located. The State disagrees, arguing that Beyer did not limit his consent to any specific area within the apartment, and that the officers were within the scope of his consent when they observed the electronic devices in plain view.

¶29 "A search conducted with consent is 'constitutionally reasonable to the extent that the search remains within the scope of the actual consent.'" *State v.*

*Wheeler*, 2013 WI App 53, ¶25, 347 Wis. 2d 426, 830 N.W.2d 278 (quoting *State v. Rogers*, 148 Wis. 2d 243, 248, 435 N.W.2d 275 (Ct. App. 1988)). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *see also State v. Kelley*, 2005 WI App 199, ¶13, 285 Wis. 2d 756, 704 N.W.2d 377. The scope of consent given is a question of fact. *State v. Garcia*, 195 Wis. 2d 68, 75, 535 N.W.2d 124 (Ct. App. 1995).

¶30　　The circuit court found that Beyer consented to the officers' entry into the apartment but did not make any other findings regarding the scope of Beyer's consent. Given the court's denial of Beyer's suppression motion, however, we must presume that the court found the scope of Beyer's consent to extend to the living room, where the electronic devices were found. *See State v. Berggren*, 2009 WI App 82, ¶18, 320 Wis. 2d 209, 769 N.W.2d 110 ("[W]hen the record does not include a specific finding on an issue, this court will assume that the issue was resolved by the [circuit] court in a manner which supports the final judgment or order."). Accordingly, to prevail on appeal, Beyer must show that this finding is clearly erroneous—that it is against the great weight and clear preponderance of the evidence. *See Anderson*, 389 Wis. 2d 106, ¶20.

¶31　　Beyer cannot meet this burden. McNulty testified that when Solberg arrived at the apartment, McNulty asked Beyer if "Solberg could go inside his apartment to grab [Beyer's] shoes and keys to lock the apartment." According to McNulty, Beyer said, "Yes." McNulty acknowledged that Beyer "gave us a general location of where they should be," but could not recall any further details. Solberg testified that he located Beyer's shoes in the hallway just inside the

13

entrance. He also testified that he looked for the keys on a desk or table "near [the] vicinity to the hallway" but did not find them there. When Solberg returned to the hallway, McNulty asked Beyer if all three men could enter the apartment to look for the keys. McNulty testified that Beyer again said yes. McNulty testified that he found the electronic devices in the living room at the end of the hallway.

¶32 Accepting as we must the officers' testimony as credible, there is no evidence, much less a great weight and clear preponderance of evidence, that when Beyer agreed to allow both officers into the apartment to look for his keys, he limited his consent to the portion of the hallway near the door. It is possible that the "general location" Beyer described in telling Solberg initially where his keys and shoes were located was the hallway. And it is possible that a reasonable person could have understood that initial exchange to limit Beyer's consent to that area the first time Solberg entered the apartment. But it is undisputed that Solberg did not locate Beyer's keys the first time he entered the apartment, and when McNulty asked Beyer if they all could go in and look for them, Beyer simply said yes. At that point, as the search that would lead to the discovery of the electronic devices began, a reasonable person would not have understood Beyer to have limited the officers to the hallway, the one location in the apartment where Solberg had already looked. When McNulty and Solberg entered for the second search, the only limitation on Beyer's consent that is apparent from the record is that they were to look for his keys. *See Jimeno*, 500 U.S. at 251 ("The scope of a search is generally defined by its expressed object."). The officers could look anywhere in the apartment where they might reasonably be found, including the living room. *See Kelley*, 285 Wis. 2d 756, ¶13 ("The police are permitted to search where the objects sought can be found.").

¶33  McNulty described seeing the electronic devices during the second search after they walked down the hallway into the living room.  Specifically, he noticed two laptop computers near a television and "multiple electronic phones and a couple USB drives."  From his testimony, it appears that the objects were in plain view when he entered the living room.  "An officer has the right to access objects in plain view while searching within the scope of consent" if: (1) the objects are in plain view; (2) the officer has the legal right to access the objects; and (3) the objects themselves, or in combination with facts known to the officer, furnish probable cause to believe they are evidence or contraband.  *Id.*, ¶15.  The record discussed above establishes the first and second prongs of this test.  And because McNulty knew that Beyer was on extended supervision and could not possess electronic devices at the time of the search, he had reason to ask Beyer if the devices were his, and when Beyer confirmed that they were, to ask for his consent to search them.

## CONCLUSION

¶34  Accepting as we must the circuit court's determination that the testimony of McNulty and Solberg was more credible than Beyer's testimony, we conclude that Beyer has not shown that the court erred in concluding that Beyer voluntarily consented to the search of his brother's apartment and that the police lawfully seized the electronic devices found in the living room.  Accordingly, the court correctly denied Beyer's suppression motion, and we affirm the judgment.

*By the Court.*—Judgment affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5