**2020 WI 53**

# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP1209-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, |
| |          Plaintiff-Respondent, |
| |   v. |
| | Mose B. Coffee, |
| |          Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 387 Wis. 2d 673,929 N.W.2d 246
PDC No:2019 WI App 25 - Published

| | |
|---|---|
| OPINION FILED: | June 5, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 21, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Winnebago |
|   JUDGE: | John A. Jorgensen |

JUSTICES:
ROGGENSACK, C.J., delivered an opinion of the court, in which ZEIGLER, J., joined. KELLY, J., filed a concurring opinion. DALLET, J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY, J., joined.
NOT PARTICIPATING:
ANN WALSH BRADLEY, J., withdrew from participation. HAGEDORN, J., did not participate.

ATTORNEYS:
    For the defendant-appellant-petitioner, there were briefs filed by *Frances Colbert*, assistant state public defender. There was an oral argument by *Frances Colbert*.

    For the plaintiff-respondent, there was a brief filed by *John A. Blimling*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *John A. Blimling*.

2020 WI 53

No. 2018AP1209-CR
(L.C. No. 2017CF542)

STATE OF WISCONSIN : IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

      **v.**

**Mose B. Coffee,**

      **Defendant-Appellant-Petitioner.**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**JUN 5, 2020**

Sheila T. Reiff
Clerk of Supreme Court

---

ROGGENSACK, C.J., delivered an opinion of the court, in which ZEIGLER, J., joined. KELLY, J., filed a concurring opinion. DALLET, J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY, J., joined.

ANN WALSH BRADLEY, J., withdrew from participation. HAGEDORN, J., did not participate.

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J. We review a decision of the court of appeals[1] affirming the circuit court[2] denial of

---

[1] *State v. Coffee*, 2019 WI App 25, 387 Wis. 2d 673, 929 N.W.2d 245.

[2] The Honorable John A. Jorgensen of Winnebago County presided.

Mose B. Coffee's motion to suppress evidence obtained from a search of a vehicle incident to his lawful arrest for Operating While Intoxicated (OWI) that Coffee argues violated the Fourth Amendment of the United States Constitution.  The court of appeals reasoned that the lawful arrest for OWI, in and of itself, supplied a basis to search the passenger compartment, and, specifically, a bag located behind the driver's seat that contained marijuana.

¶2  We disagree that the lawful arrest for OWI, in and of itself, supplied a sufficient basis to search the passenger compartment of Coffee's vehicle.  However, the search was lawful because police had reasonable suspicion, based on the totality of the circumstances, that the passenger compartment, and, specifically, the bag, might contain evidence of OWI. Accordingly, we affirm the court of appeals.

## I.  BACKGROUND

¶3  Officer Timothy Skelton works for the Oshkosh Police Department.  On August 30, 2017, at 11:17 p.m., he observed an automobile driving on a city street that did not have a front license plate.  He instituted a traffic stop, "which was eventually completed in the parking lot" of a restaurant or bar.

¶4  The automobile parked close to another vehicle. Skelton testified:

> As the vehicle had pulled into the parking lot, there were other vehicles that were already parked. . . .  [I]n this case the vehicle as it pulled in pulled in at an angle and very close to a vehicle that was -- it would be on the driver's side.  My estimation was that it was no more than two feet from

2

the other vehicle, making it very -- it was very close to the other vehicle and somewhat at an angle.

Body camera footage shows that Coffee's vehicle was over the yellow line on the driver's side.

¶5 Skelton explained why he found how the vehicle was parked noteworthy:

> Well, it was the fact that I was performing the traffic stop and the vehicle continued into the parking lot. And the way it had parked, the driver immediately was getting out of his vehicle so it was almost as if he was -- knew I was behind him and was getting out quickly.

¶6 Skelton asked the driver, Coffee, to stay in the vehicle. "When asked how much he had to drink and from where was he coming, [Coffee] stated he was coming from a friend's house and that he had not had that much."

¶7 Skelton believed that Coffee was intoxicated. Coffee's speech was slurred, and his eyes were "very glazed over and bloodshot." Skelton testified that the "glazed over look in his eyes" was a sign that Coffee was "possibly impaired by intoxicants and or other controlled substances." According to the affidavit supporting the criminal complaint, "Skelton could smell an odor of intoxicants coming from the vehicle." Skelton also testified that after he had Coffee "sit down in his car" he smelled "an odor of intoxicants coming from his person or from the vehicle." Based on these observations, Skelton decided to ask Coffee to step out of the vehicle, so he could administer field sobriety tests.

¶8 As Skelton walked with Coffee to conduct a test, he realized that he met Coffee a few weeks prior. He recalled that Coffee had been "very quiet at that time." Yet, Coffee was presently "very talkative."

¶9 Coffee performed poorly on field sobriety tests. He exhibited all six clues on the Horizontal Gaze Nystagmus test, failed to complete the nine-step-walk-and-turn test and sang the alphabet twice after being instructed to state the alphabet twice in a row without singing. Skelton then administered a preliminary breath test, which indicated that Coffee had a prohibited alcohol level of .14.[3]

¶10 Skelton arrested Coffee and secured him in the back of his squad car. Skelton then instructed two other officers at the scene, Brenden Bonnett and Benjamin Fenhouse, to search the passenger compartment. Skelton informed the two that Coffee had been arrested "for operating under the influence of alcoholic beverages."

¶11 Bonnett testified that "the subject was in custody for impaired driving." Therefore, "I'd be looking for any substance in the vehicle that could impair a driver's ability to operate the motor vehicle safely." He further testified that he was "looking for any substance, whether that could be prescription medication, nonprescription medication, alcohol, illegal drugs, or even up to possibly an inhalant such as Dust-Off -- can of

---

[3] A blood test indicated Coffee's BAC was .17.

4

Dust-Off I know has been used before also as a substance which has impaired drivers."

¶12 Bonnett found a cloth bag "right behind the driver's seat, whereas in the driver could have moved it with his arm while seated in the driver's seat." "Inside that cloth bag were two mason jars. Inside the mason jars were flakes of what was suspected to be marijuana." Bonnett testified that he had to "dig through the bag" before locating the jars because there were other items on top that concealed them from sight.[4]

¶13 After Bonnett found the jars with what appeared to be flakes of marijuana, Fenhouse searched the trunk of the vehicle. Fenhouse found an additional 930.7 grams of marijuana and drug paraphernalia.

¶14 The State charged Coffee with possession with intent to deliver THC, possession of drug paraphernalia, second-offense OWI and second-offense OWI with a prohibited alcohol concentration. Coffee moved to suppress "all evidence obtained" from the search.

¶15 After a contested hearing, the circuit court concluded that the search did not violate the Fourth Amendment. The court found that the search of the bag was permissible because it was within reach from the driver's seat. The circuit court also explained, "I'm really not putting much weight on the fact of

---

[4] Among these items were many cell phones. Additionally, the bag also contained little plastic bags, though Bonnett could not recall on the stand whether he saw the little plastic bags before he saw the jars. The body camera footage is unclear.

where exactly that bottle was found because it doesn't matter if the defendant just threw it on top of the bag or to conceal it pushed it down to the bottom or in the middle.  That's easily done."

¶16 After the circuit court denied Coffee's motion, he reached a plea agreement with the State.  He pled no-contest to possession with intent to deliver THC and second-offense OWI. The two other counts were dismissed.  After sentencing, Coffee appealed.

¶17  The court of appeals affirmed.  State v. Coffee, 2019 WI App 25, 387 Wis. 2d 673, 929 N.W.2d 245.  It stated:

> [A]s a matter of law . . . when an officer lawfully arrests a driver for OWI, even if alcohol is the only substance detected in relation to the driver, a search of the interior of the vehicle, including any containers therein, is lawful because it is reasonable to believe evidence relevant to the offense of OWI might be found.

Id., ¶13.

¶18  We granted Coffee's petition for review, which argued that the court of appeals ignored the particular facts of the case.  Coffee argued that the court applied a bright-line rule, and therefore, the search was not justified by the totality of the circumstances.  We agree that bright-line rules are disfavored by the United States Supreme Court in its Fourth Amendment jurisprudence; however, we affirm because the totality of the circumstances provided the foundation for concluding that the search was reasonable.

## II. DISCUSSION

### A. Standard of Review

¶19 Review of a decision denying a motion to suppress under the Fourth Amendment presents a question of constitutional fact. State v. Tullberg, 2014 WI 134, ¶27, 359 Wis. 2d 421, 857 N.W.2d 120. We employ a two-step inquiry when presented with a question of constitutional fact. State v. Robinson, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463; see also State v. Dearborn, 2010 WI 84, ¶13, 327 Wis. 2d 252, 786 N.W.2d 97.

¶20 First, we uphold the circuit court's findings unless they are clearly erroneous. State v. Richter, 2000 WI 58, ¶26, 235 Wis. 2d 524, 612 N.W.2d 29. Second, we independently apply constitutional principles to the facts. Id.; see also Dearborn, 327 Wis. 2d 252, ¶13. These principles require an objective application of the facts, meaning we independently examine the facts known to the officer at the time of the warrantless search. We do not analyze what the officer subjectively believed or what inferences he or she actually drew.

¶21 In the present case, we apply this two-step inquiry to determine whether the search of the passenger compartment, and, specifically, the bag, was unreasonable under the Fourth Amendment.[5] The burden is on the State to prove that the search

---

[5] Article I, § 11 of the Wisconsin Constitution is nearly identical to the Fourth Amendment. We normally interpret Article I, § 11 consistent with the United States Supreme Court's interpretation of the Fourth Amendment. E.g., State v. Dearborn, 2010 WI 84, ¶¶14-17, 327 Wis. 2d 252, 786 N.W.2d 97; State v. Arias, 2008 WI 84, ¶20, 311 Wis. 2d 358, 752

(continued)

7

was constitutionally permissible because police did not obtain a warrant prior to searching the vehicle. State v. Johnston, 184 Wis. 2d 794, 806, 518 N.W.2d 759 (1994) (citing United States v. Jeffers, 342 U.S. 48, 51 (1951)); State v. Phillips, 2009 WI App 179, ¶7, 322 Wis. 2d 576, 778 N.W.2d 157.

### B. Fourth Amendment Principles

¶22 The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

As the text makes clear, "the Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." Tulberg, 359 Wis. 2d 421, ¶29 (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991); see also Riley v. California, 573 U.S. 373, 381 (2014) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).

¶23 A search is unreasonable if the individual's privacy interest in the area searched is not outweighed by "the promotion of legitimate governmental interests."[6] Virginia v.

---

N.W.2d 748. Coffee has not argued that we should decide this case under the Wisconsin Constitution, and, therefore, we do not address Article I, § 11.

[6] We have considered the practices of the founding generation to determine if a search was unreasonable. Virginia v. Moore, 553 U.S. 164, 168 (2008) ("In determining whether a
(continued)

8

Moore, 553 U.S. 164, 171 (2008) (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)). If a search was unreasonable, evidence obtained from it is subject to exclusion. Mapp v. Ohio, 367 U.S. 643, 655 (1961).

¶24 "A warrantless search is presumptively unreasonable," Tullberg, 359 Wis. 2d 421, ¶30, because "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent," Johnson v. United States, 333 U.S. 10, 14 (1948). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment——subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).

¶25 One such exception was announced in Arizona v. Gant, 556 U.S. 332, 335 (2009): "[C]ircumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." Automobiles are movable, making plausible an automobile's escape from a jurisdiction or concealment before a warrant can be obtained. Carroll v. United

---

search or seizure is unreasonable, we begin with history."). However, "the historical scope of officers' authority to search vehicles incident to arrest is uncertain." Arizona v. Gant, 556 U.S. 332, 351 (2009) (Scalia, J., concurring) (citing Thornton v. United States, 541 U.S. 615, 629–31 (2004) (Scalia, J., concurring in judgment)).

States, 267 U.S. 132, 151–53 (1925).  Therefore, people have a lower expectation of privacy in an automobile, and the legitimate governmental interest in a warrantless search is stronger.[7]  The legitimate governmental interests, in this case, are particularly strong given the havoc wreaked by intoxicated drivers.[8]  Therefore, if the Gant exception is satisfied, the search cannot be unreasonable because the exception articulates a balancing of interests sufficient for this case.

### C.  Interpretations of Gant

¶26  The Gant exception has generated much discussion.  One issue concerned whether the nature of an offense of arrest, in

---

[7] To further explain, an automobile's "function is transportation and it seldom serves as one's residence or as the repository of personal effects.  A car has little capacity for escaping public scrutiny.  It travels public thoroughfares where both its occupants and its contents are in plain view." United States v. Knotts, 460 U.S. 276, 281 (1983) (quoting Cardwell v. Lewis, 417 U.S. 583, 590 (1974) (plurality)).

Furthermore, police are required to be in "frequent contact with automobiles" in the course of their duties.  South Dakota v. Opperman, 428 U.S. 364, 367–68 (1976).  "Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements."  Id. at 368.  "As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order."  Id.

[8] "No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." Missouri v. McNeely, 569 U.S. 141, 160 (2013) (quoting Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 451 (1990)).

10

and of itself, can supply a basis for a search of a passenger compartment, or whether the search must be analyzed by examining the totality of the circumstances. The first approach is known as the "categorical approach," and the second, the "reasonableness approach."

### 1. The Categorical Approach

¶27 The categorical approach stems from two quotes in Gant:

> [1.] In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence. But in others, . . . the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any container therein.
>
> . . . .
>
> [2.] Gant was arrested for driving with a suspended license——an offense for which police could not expect to find evidence in the passenger compartment of Gant's car.

Gant, 556 U.S. at 343-44. Interpreting these quotes, a Florida appellate court was the first to "reason[] that the [United States] Supreme Court intended to give its imprimatur to a system of classifying criminal offenses into two distinct groups: those that 'by [their] nature . . . might yield physical evidence' and those 'for which there is no physical evidence.'" United States v. Reagan, 713 F. Supp. 2d 724, 731 (E.D. Tenn. 2010) (quoting Brown v. State, 24 So. 3d 671, 678 (Fla. App. 2009)). Under this interpretation of Gant, relevant evidence of some crimes, such as the possession of a controlled

11

substance, might be in the passenger compartment of an automobile. Reagan, 713 F. Supp. 2d at 731 (citing Brown, 24 So. 3d at 677). However, relevant evidence of other crimes, such as minor traffic violations, will not be in the passenger compartment. Reagan, 713 F. Supp. 2d at 731 (citing Brown, 24 So. 3d at 677). A search of a passenger compartment is permissible if a recent occupant was arrested for the former; for the latter, a search is not permissible.

¶28 Following the Florida court's interpretation, some courts have concluded that OWI is, by its nature, a crime for which there might be relevant evidence in the passenger compartment. State v. Cantrell, 233 P.3d 178, 185 (Idaho 2010) ("Cantrell was arrested for DUI, and the DUI supplied the basis for the search."); People v. Nottoli, 130 Cal. Rptr. 3d 884, 902 (2011) ("Reid's arrest for 'being under the influence of a controlled substance' supplied a reasonable basis for believing that evidence 'relevant' to that type of offense might be in his vehicle.").[9]

---

[9] Compare Cain v. State, 373 S.W.3d 392, 396-97 (Ark. App. 2010) (reasoning that an arrest for DUI supplied the basis for a search of an automobile under Gant because "an open container of alcohol could have been found"), with id. at 399 (Brown, J., dissenting) ("Officers must be put on notice about what is allowed following Gant, and the majority fails to define these limitations. Instead, the majority sends the message that nothing has changed and officers can continue to search a vehicle incident to a lawful arrest without anything more to prompt such a search.").

¶29 These courts reason that relevant evidence of an OWI might be located in the passenger compartment and any container therein. For example, the court of appeals reasoned in this case:

> Not only <u>could</u> an officer find evidence related to the offense of OWI, it indeed would not be surprising for an officer to find such evidence as, for example, a copy of a credit card receipt showing very recent purchases of alcoholic drinks at a local bar, a partially or fully consumed can of beer or bottle of hard liquor, a prescription drug bottle, or drug paraphernalia or residue.

<u>Coffee</u>, 387 Wis. 2d 673, ¶12. The court of appeals also stated:

> We need not detail the copious cases across this state and country in which a driver is arrested for OWI, a search of the vehicle is conducted, and alcoholic beverages and/or drugs are found. . . . "It is certainly logical and reasonable to expect that items related to alcohol or drug consumption, such as alcoholic beverage bottles or drug paraphernalia, might readily be contained in the intoxicated driver's car."

<u>Id.</u>, ¶12 n.6 (quoting <u>People v. Evans</u>, 133 Cal. Rptr. 3d 323, 336-37 (2011)).

### 2. The Reasonableness Approach

¶30 Other courts have interpreted <u>Gant</u> as imposing a reasonableness approach. Though stated in various terms, the approach involves "looking at common sense factors and evaluating the totality of the circumstances" to determine whether it was reasonable to conclude that evidence of the crime of the arrest might be found within the vehicle. <u>Reagan</u>, 713 F. Supp. 2d at 728 (quoting <u>United States v. Pruitt</u>, 458 F.3d 477, 482 (6th Cir. 2006)).

13

¶31 Courts so interpreting Gant have struggled with the "quantum of suspicion required." State v. Eversole, 2017-Ohio-8436, unpublished slip op., ¶23, 2017 WL 5127369 (Ohio Ct. App. Nov. 6, 2017). Unlike the categorical approach, which does not utilize facts particular to the case, the reasonableness approach requires particularization. United States v. Taylor, 49 A.3d 818, 826 (D.C. Ct. App. 2012).

¶32 Determining the quantum of suspicion required is difficult for at least three reasons. First, Gant stated the exception four times, twice using the word "might" and twice without using "might." Compare Gant, 556 U.S. at 335, 343 ("reasonable to believe that evidence of the offense of arrest might be found in the vehicle"), with id. at 346, 351 ("reasonable to believe the vehicle contains evidence of the offense of arrest"). Second, "reasonable to believe" is language sometimes used to describe the quantum of suspicion necessary for probable cause.[10] And third, Gant provides little explanation of the exception.

¶33 Most courts have concluded that the officer does not need probable cause to believe evidence of the crime will be found in the vehicle. Cantrell, 233 P.3d at 183. But see United States v. Grote, 629 F. Supp. 2d 1201, 1203 (E.D. Wash. 2009). Otherwise, the Gant exception would be the same as

---

[10] Wayne R. LaFave, 2 Search & Seizure § 3.7(d) (5th ed. updated Oct. 2019) (collecting cases that use "reasonable to believe" to describe the quantum of suspicion necessary for an officer to have probable cause).

14

another simply known as the "automobile exception," and Gant stated the two exceptions are distinct. United States v. Vinton, 594 F.3d 14, 25 (D.C. 2010) (citing Gant, 556 U.S. at 347).

¶34 Some courts have equated the Gant exception with reasonable suspicion but others have crafted a standard somewhere between probable cause and reasonable suspicion. Compare Taylor v. State [hereinafter Taylor Md.], 137 A.3d 1029, 1033-34 (Md. 2016) (equating the standard in Gant with reasonable suspicion) and State v. Ewertz, 305 P.3d 23, 27-28 (Kan. Ct. App. 2013) (same), with Reagan, 713 F. Supp. 2d at 728 (quoting Pruitt, 458 F.3d at 482) (noting the standard in Gant does not require probable cause and stating that a "[r]easonable belief is established by looking at common sense factors and evaluating the totality of the circumstances"). At least one United States Supreme Court justice believes the Gant exception requires reasonable suspicion. Megginson v. United States, 556 U.S. 1230, 1230 (2009) (Alito, J., dissenting from a decision to grant, vacate, and remand) ("This case thus appears to present an important question regarding the meaning and specificity of the reasonable suspicion requirement in Gant.").

¶35 Whatever the quantum, courts have considered a variety of circumstances to determine whether the quantum was satisfied: Whether the officer observed the driver using an intoxicant;[11] whether the officer observed an intoxicant in plain

---

[11] United States v. Reagan, 713 F. Supp. 2d 724, 733 n.7 (continued)

15

view inside the passenger compartment;[12] whether an occupant made a statement indicating that an intoxicant is in the automobile;[13] whether the officer smelled an intoxicant emanating from the passenger compartment;[14] whether "the driver was traveling from a location such as a recreational area or campground where alcohol is not available unless it is transported in by private vehicle;"[15] whether the occupant made "furtive movements," indicating that the occupant might be trying to conceal evidence;[16] whether the occupant evidenced extreme intoxication;[17]

---

[12] Id.

[13] Id.; see also United States v. Francis, No. 11-40064-01-RDR, unpublished slip op., 2011 WL 5837182, at *3 (D. Kan. Nov. 21, 2011) (noting the driver made statements indicating she took medication).

[14] Reagan, 713 F. Supp. 2d at 733 n.7; see also Francis, 2011 WL 5837182, at *3.

[15] Reagan, 713 F. Supp. 2d at 733 n.7; see also State v. Wilson, No. 1 CA-CR 11-0292, unpublished slip op., ¶19, 2012 WL 1255151 (Ariz. Ct. App. Apr. 12, 2012) ("The police had received prior tips about suspected drug activity at Appellant's residence, Johnston had recently entered that residence before leaving with Appellant in his vehicle . . . .").

[16] State v. Ewertz, 305 P.3d 23, 27 (Kan. Ct. App. 2013) (quoting State v. Julian, No. 105,695, unpublished slip op., 2012 WL 1759405, at *5 (Kan. Ct. App. May 11, 2012) (per curiam), rev'd State v. Julian, 333 P.3d 172 (Kan. 2014), overruled by State v. James, 349 P.3d 457 (Kan. 2015)).

[17] Ewertz, 305 P.3d at 28 ("In addition to evidence that the car Ewertz was driving swerved in its lane and crossed over the fog line, that Tatro smelled alcohol in the car after he pulled Ewertz over, that Ewertz failed field sobriety tests, that Ewertz had glassy and bloodshot eyes, and that Ewertz slurred

(continued)

16

whether the officer had knowledge of prior unlawful conduct by an occupant involving an intoxicant in an automobile;[18] whether the officer had knowledge regarding the likelihood of locating an intoxicant in an automobile driven by an intoxicated person.[19]

### 3. Our Approach

¶36 We interpret Gant as imposing the reasonableness approach. Our conclusion is consistent with the principle that bright-line rules are disfavored in United States Supreme Court Fourth Amendment jurisprudence. Myron Moskovitz, A Rule in Search of A Reason: Empirical Reexamination of Chimel and Belton, 2002 Wis. L. Rev. 657, 679. Furthermore, the

---

her words, there is also evidence that Ewertz admitted to drinking at least one alcoholic beverage before driving the car. In light of these specific and articulable facts, as well as any rational inferences that can be drawn from those facts, we conclude the district court did not err in finding it was 'reasonable to believe' evidence relevant to the crime of driving under the influence might be found in Ewertz' vehicle.").

[18] United States v. Lopez, No. CR 18-120-BLG-SPW-TJC, slip op., 2019 WL 7838283, at *8 (D. Mont. Dec. 18, 2019) ("Officer Miner also testified that he knew drugs had been found in a safe in Lopez's vehicle when Lopez was previously arrested for driving under the influence of a controlled substance in Montana. While law enforcement cannot rely on past criminal history alone to find reasonable suspicion, it can be considered as part of the totality of the circumstances.").

[19] Taylor v. State, 137 A.3d 1029, 1034 (Md. 2016). But see United States v. Taylor, 49 A.3d 818, 827 (D.C. Ct. App. 2012) ("'[W]e know too little about Officer [Weber's] experience' to place much weight upon his conclusory statement that 'typically someone who is driving under the influence also has an open container or multiple containers of alcohol in their vehicle.'" (internal citation omitted)).

categorical approach is analytically difficult. Lastly, the briefings and result in Gant do not support the categorical approach.

### a. Bright-Line Rules Are Disfavored

¶37 Bright-line rules, such as the categorical approach, are disfavored in Fourth Amendment United States Supreme Court jurisprudence. Missouri v. McNeely, 569 U.S. 141, 158 (2013) (plurality). This is because a strict application of a bright-line rule could be used to justify a search even though, under the particular facts, the search is unreasonable. Reagan, 713 F. Supp. 2d at 732. Case-by-case analysis is, therefore, preferred. McNeely, 569 U.S. at 158. "Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules, including in situations that are more likely to require police officers to make difficult split-second judgments." Id. (citing Illinois v. Wardlow, 528 U.S. 119, 123–125 (2000); Ohio v. Robinette, 519 U.S. 33, 39–40 (1996); Tennessee v. Garner, 471 U.S. 1, 8–9 (1985)). Indeed, although, the legitimate governmental interest in limiting the number of OWIs is substantial, a plurality in McNeely rejected that this legitimate governmental interest is so strong as to justify a bright-line rule permitting warrantless blood draws when an officer has probable cause to believe that an arrestee is intoxicated. McNeely, 569 U.S. at 160.

¶38 Nevertheless, bright-line rules occasionally have been adopted to provide clear guidance to officers. New York v.

18

Belton, 453 U.S. 454, 458 (1981), abrogation recognized by Davis v. United States, 564 U.S. 229, 234 (2011). Quoting Professor LaFave, the Court in Belton explained:

> A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be "literally impossible of application by the officer in the field."

Id. (quoting Wayne R. LaFave, "Case-by-Case Adjudication" Versus "Standardized Procedures": The Robinson Dilemma, 1974 S. Ct. Rev. 127, 141).

¶39 However, the Fourth Amendment generally requires police to obtain a warrant because judges, and not police, are better trained to determine whether a search will be unreasonable. See Johnson, 333 U.S. at 14. "The preference for warrants is premised on the expectation that magistrates will be more likely than officers to perceive when justification for a proposed search is inadequate." Thomas Y. Davies, Recovering the Original Fourth Amendment, 98 Mich. L. Rev. 547, 576 (1999).

¶40 "While the desire for a bright-line rule is understandable, the Fourth Amendment will not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake." McNeely, 569 U.S. at 158. Therefore, the rationale for adopting a bright-line rule permitting a type of warrantless search cannot be merely that police would benefit from clear guidance. There has to be some reason that police

19

need guidance in the same way that there has to be some reason for police not to obtain a warrant.[20]

¶41 A bright-line rule might be justified "[w]hen officer safety or imminent evidence concealment or destruction is at issue, [because] officers should not have to make fine judgments in the heat of the moment. But in the context of a general evidence-gathering search, the state interests that might justify any overbreadth are far less compelling." Thornton v. United States, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in judgment). Justice Scalia, in his Thornton concurrence, explained that when an arrestee is secured in the back of a squad car, a search of the passenger compartment cannot be justified on the ground that "the arrestee might grab a weapon or evidentiary item from his car." Id. at 629. If the search is justifiable, it is "simply because the car might contain evidence relevant to the crime for which he was arrested." Id. To him, "[t]his more general sort of evidence-gathering search [was] not without antecedent." Id. His comments are telling because the majority in Gant purported it was following Justice Scalia's suggestions from Thornton. Gant, 556 U.S. at 335.

¶42 In the case before us, Coffee was secured in the back of a squad car; therefore, the search cannot be justified

---

[20] For example, in United States v. Robinson, 414 U.S. 218, 235 (1973), the Court concluded that police have authority to search an arrestee's person and that this authority stems from the lawful arrest and the need for personal safety of the officer.

because of concerns over officer safety or imminent evidence concealment or destruction. If the search was lawful, it must be because a general evidence-gathering search is permitted under these circumstances. Police did not need a bright-line rule under the totality of the circumstances here because they were not required to make split-second decisions. Thornton, 541 U.S. at 632 (Scalia, J., concurring in judgment).

### b. Difficulty of the Categorical Approach

¶43 But even if police needed more guidance, the categorical approach would not provide it. Some offenses are not easily categorized, which makes the categorical approach analytically difficult. "[A]ny attempt to categorize every criminal offense as being either one that might yield physical evidence or one for which there is no physical evidence runs into interpretative problems." Reagan, 713 F. Supp. 2d at 732.

¶44 For example, a driver could be arrested for making criminal threats. Evans, 133 Cal. Rptr. 3d at 336. "If the threat in question was verbal, it is surely unreasonable to expect evidence related to the crime to be contained in a vehicle." Id. "But if the threat was made in a text message, or amplified by means of props or a threatening drawing, evidence might well be found in the car." Id.

¶45 To give one more example, a driver could be arrested for battery or assault. Id. "If such crimes were committed with fists alone, it would generally be unreasonable to expect evidence of the offense in the arrestee's vehicle; if committed with a brick or broken bottle, on the other hand, the opposite

21

might be true." Id. "Even in the case of a fistfight, might it be reasonable to expect to find blood, or perhaps a broken fingernail, in the vehicle?" Id. To summarize, a problem with the categorical approach is that "some offenses of arrest cannot be meaningfully evaluated without reference to the specific facts known to the officer." Id. The point of adopting a bright-line rule is to provide definitive guidance; if that is not being accomplished, a bright-line rule serves no useful purpose.

c. The Briefings and Result in Gant

¶46 Lastly, the briefings and result in Gant suggest that the United States Supreme Court did not create a categorical approach. Gant involved a traffic stop for driving with a suspended license in Arizona. Unlike many states, in Arizona, driving with a suspended license is not a strict liability offense.[21] The State must prove that the driver either knew or should have known his or her license was suspended.

¶47 In Gant, Arizona admitted, "In most arrests for traffic-related offenses, the preservation of evidence justification for a search incident to arrest will not exist." Pet'r Reply Br. on the Merits, at 26, Gant v. Arizona, 556 U.S. 332 (2009) (No. 07-542). However, Arizona argued:

> That is not true in this case. Under Arizona law, a person is guilty of driving on a suspended license only if "the driver knew or should have known that the

---

[21] State v. Williams, 698 P.2d 732, 734 (Ariz. 1985) (en banc).

22

license has been suspended." Officer Griffith testified that "[l]icense paperwork from the court system" could possibly be found in the vehicle. Officer Reed testified that it would not be unusual to find "notification from Motor Vehicle Division that [Gant's] license has been suspended" or "a citation for a suspended license that would show that he had knowledge that his driver's license was suspended" in the vehicle. Thus, Gant's assertion that the "officers had no reason to believe that 'evidence relevant to the crime of arrest might be found' in [his] car" is inaccurate.

Id. at 26 n.7 (alterations in original) (internal citations omitted); see also Pet'r Br. on the Merits, at 6–7, nn.1–2, Gant v. Arizona, 556 U.S. 332 (2009) (discussing the testimony of the officers).

¶48 Therefore, if the Gant exception were a categorical approach, Gant should have permitted the search: the passenger compartment might have contained relevant evidence of the offense of arrest. But Gant concluded that the search was unconstitutional. Gant, 556 U.S. at 351. Other courts, noting this potential contradiction, have refused to apply the categorical approach. People v. Chamberlain, 229 P.3d 1054, 1057 (Colo. 2010) (en banc); see also Andrew Fois & Lauren Simmons, Thomas Jefferson's Carriage: Arizona v. Gant's Assault on the Belton Doctrine, Am. U. Crim. L. Br., Winter 2009, at 4, 22 ("The Court . . . holds that in Gant there is no reason to so believe . . . [that] the car could contain evidence of the crime of suspended license. It is reasonable, however, to believe that the license itself, the car registration, or other evidence supporting the charge could have been found in the glove compartment.").

¶49 The only way to interpret Gant as imposing a categorical approach is to assume that the justices did not fully analyze the briefs: that is untenable. In combination with the above, we interpret Gant as imposing the reasonableness approach.

## C. Application

¶50 We conclude that the reasonableness approach is the correct interpretation of Gant. Here, the totality of circumstances objectively demonstrates that Skelton had reasonable suspicion that the passenger compartment, and, specifically, the bag, might contain relevant evidence of OWI. Therefore, the search was permissible under the Fourth Amendment.

¶51 Coffee's counsel admitted at oral argument that "We are talking about reasonable suspicion." We conclude that is the correct understanding of the reasonableness approach. Taylor Md., 137 A.3d at 1030; Ewertz, 305 P.3d at 27–28. First, the Gant exception cannot require probable cause because then it would merely repeat the automobile exception. Vinton, 594 F.3d at 25. Second, one United States Supreme Court justice has referred to the Gant exception as requiring reasonable suspicion. Megginson, 556 U.S. at 1230 (Alito, J., dissenting from a decision to grant, vacate, and remand).

### 1. The Passenger Compartment

¶52 Skelton had reasonable suspicion that the passenger compartment might contain relevant evidence of OWI. First, Skelton testified that when he had Coffee sit in the vehicle, he

24

smelled "an odor of intoxicants coming from [Coffee's person] or from the vehicle." Reagan, 713 F. Supp. 2d at 733 n.7. Although he used a disjunctive "or" to describe where the smell was coming from, his testimony offers support in favor of reasonable suspicion. Furthermore, the affidavit does not use the disjunctive, or. It states that a smell of intoxicants was coming from the automobile.

¶53 Second, Coffee indicated that he was coming from his friend's house. Generally, a private residence has alcohol only if it is brought to the residence. Cf. id. Coffee might have brought the alcohol that he consumed to his friend's house and have retained some in his vehicle. The facts of this case are different than, for example, a case where an officer observes a patron drink at a bar and then immediately get into an automobile. Id. at 732.

¶54 Third, after Skelton initiated the traffic stop Coffee "continued into the parking lot," which could indicate that Coffee was hesitant to pull over because he knew there was something in the automobile that he should not have had. Cf. Patel v. State, 522 S.E.2d 760, 761 (Ga. Ct. App. 1999) (reasoning that the failure to "immediately pull over" can inform an officer's probable cause determination); United States v. Gonzalez-Guytan, 419 F. App'x 848, 849 (10th Cir. 2011) (same).

¶55 Fourth, Coffee acted strangely upon pulling into the parking lot because he hastily parked and immediately got out of his vehicle. Ewertz, 305 P.3d at 27. Coffee's careless parking

25

and hasty exit from his vehicle could indicate that he was trying to distance himself from something in the vehicle that he knew he should not have had. Stated otherwise, his actions indicated that he did not want to interact with police near his vehicle, perhaps because he did not want them to discover something in it.

¶56 Fifth, Skelton had previously interacted with Coffee. At that prior meeting, Coffee had been quiet, but on this occasion, was talkative, about a variety of topics. From this, Skelton could have believed Coffee was nervous because he had something to hide. Cf. United States v. Vergara-Manzo, No. 13-10179-EFM, unpublished slip op., 2014 WL 840722, at *5 (D. Kan. Mar. 4, 2014) (reasoning that an occupant being "extremely talkative" could contribute to an officer's determination to search the automobile).

¶57 Sixth, Coffee was extremely intoxicated. Ewertz, 305 P.3d at 28. He exhibited all six clues on the Horizontal Gaze Nystagmus test, failed to complete the nine-step-walk-and-turn test and sang the alphabet twice after being instructed to state the alphabet twice in a row without singing. Furthermore, Coffee's speech was slurred, and his eyes were "very glazed over and bloodshot." He also parked poorly. He was over the yellow line on the driver's side. As Justice Scalia explained in his Thornton concurrence, "it is not illogical to assume that evidence of a crime is most likely to be found where the suspect was apprehended." Thornton, 541 U.S. at 630 (Scalia, J., concurring in judgment). Similarly, when a person is extremely

26

intoxicated, it is not illogical to assume intoxicants might be close by.

¶58 Coffee has two arguments, neither of which cause the search of the vehicle's passenger compartment to be unreasonable. First, he argues that Skelton needed to know more to have reasonable suspicion. Skelton did not observe a bottle cap or open container nor was he tipped off that Coffee had been using an intoxicant in the vehicle. But the quantum of suspicion required is not probable cause: it is reasonable suspicion. Although Coffee acknowledges that reasonable suspicion is the correct quantum, his argument is phrased in a manner that assumes probable cause is necessary.

¶59 Second, Coffee would have us conclude that his privacy interest outweighs the legitimate governmental interests because the probative value of evidence that might have been present in the passenger compartment is minimal, i.e., the primary evidence of OWI is the result of a blood test. We reject this argument because the balancing of interests has already been done by the United States Supreme Court in establishing the Gant exception. Moreover, other courts have rejected Coffee's argument because "a DUI trial does not start and end with a breathalyzer report." Cantrell, 233 P.3d at 185; see also Grote, 629 F. Supp. 2d at 1205. We agree. Just because the result of a blood test could be sufficient evidence to secure a conviction does not mean that it will be. Police do not have the luxury of knowing what will happen at trial and must collect evidence without the benefit of

27

hindsight. Police may search for relevant evidence; they are not required to weigh its probative value.

## 2. The Bag

¶60 Coffee also argues, "[e]ven if it were reasonable to search the vehicle, it was not reasonable to believe evidence of the OWI would be at the bottom of the bag." To explain, Coffee argues that Skelton did not see a furtive movement that would have indicated Coffee tried to hide something in the bag. Therefore, Coffee minimizes the circuit court's finding that relevant evidence could have "easily" been pushed down because, Coffee contends, if such an action occurred, it would have been seen by Skelton.

¶61 Coffee's argument borders on an objection to the circuit court's findings. Under the applicable standard of review, we cannot disturb those findings because they are not clearly erroneous. Richter, 235 Wis. 2d 524, ¶26. Moreover, Coffee could have gotten intoxicated at his friend's house and then put the intoxicant in the bag in order to carry it to his car. Indeed, the United States Supreme Court has explained, "[d]uring virtually the entire history of our country——whether contraband was transported in a horse-drawn carriage, a 1921 roadster, or a modern automobile——it has been assumed that a lawful search of a vehicle would include a search of any container that might conceal the object of the search." United States v. Ross, 456 U.S. 798, 820 n.26 (1982). "Contraband goods rarely are strewn across the trunk or floor of a car; since by their nature such goods must be withheld from public

28

view, they rarely can be placed in an automobile unless they are enclosed within some form of container." Id. at 820.

¶62 This case is unlike, for example, State v. Hinderman, No. 2014AP1787-CR, unpublished slip. op. (Wis. Ct. App. Feb. 12, 2015), on which Coffee relied below. Hinderman was arrested for OWI because she appeared drunk. Id., ¶¶2-3. Police searched her automobile incident to the arrest. Id., ¶4. On the passenger seat was her purse. Id., ¶3. Police "looked inside the purse and found a closed, red zippered pouch, approximately three-by-three inches in length and one-half inch to three quarters of an inch wide." Id., ¶4. Inside the pouch was drug paraphernalia and "a clear plastic bag containing marijuana." Id. The State argued that the search of the pouch was permissible because it might have contained a one-shot bottle of alcohol, similar to what is commonly served on passenger jets. Id., ¶12. In a one-judge opinion, the court of appeals rejected this argument and concluded that the search violated the Fourth Amendment. Id., ¶14. Its conclusion rested heavily on a finding by the circuit court that the pouch was unlikely to contain a one-shot bottle. Id., ¶12.

¶63 We need not decide whether Hinderman was correct. It is sufficient to say, Hinderman presented on different facts. In this case, the bag police searched was significantly larger. It could have contained regular-sized bottles of alcohol. Whether police can search a small pouch, on the ground that they might find a one-shot bottle, or, as the court of appeals mentioned in this case, a credit card receipt showing very

29

recent purchases of alcoholic drinks at a local bar, is beyond the scope of this case.

### III.  CONCLUSION

¶64  We disagree that the lawful arrest for OWI, in and of itself, supplied a sufficient basis to search the passenger compartment of Coffee's vehicle.  However, the search was lawful because police had reasonable suspicion, based on the totality of the circumstances, that the passenger compartment, and, specifically, the bag, might contain evidence of OWI. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶65  ANN WALSH BRADLEY, J., withdrew from participation.

¶66  BRIAN HAGEDORN, J., did not participate.

¶67 DANIEL KELLY, J. (concurring). I concur with the court's judgment. But I think the court handled Gant[1] in a fashion that brings less rather than more clarity to the law controlling post-arrest evidence-gathering automobile searches. The court suggests Gant addressed itself to this question: "[W]hether the nature of an offense of arrest, in and of itself, can supply a basis for a search of a passenger compartment, or whether the search must be analyzed by examining the totality of the circumstances." Lead op., ¶26. The literature, as well as judicial opinions, generally refer to the former as the "categorical approach," and the latter as the "reasonableness approach." And in so referring, they have contributed to the court's understanding that Gant created a new analytical methodology that is taxonomically distinct from the extant exceptions to the warrant requirement. But the Gant court did not announce a new analytical model. Instead, it returned to ancient principles governing searches incident to arrest and applied them to the automobile context.

¶68 Gant's significance lies in it's effort to fix a specific jurisprudential problem. The Supreme Court realized that, after its decision in New York v. Belton, 453 U.S. 454 (1981), abrogation recognized by United States v. Davis, 564 U.S. 229 (2011), police officers started conducting post-arrest evidence-gathering automobile searches as a matter of course, and in some quarters such searches were understood as a police

---

[1] Arizona v. Gant, 556 U.S. 332 (2009).

1

officer's entitlement. See Arizona v. Gant, 556 U.S. 332, 335 (2009). There is good reason for the explosion of such searches. Belton held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." 453 U.S. at 460 (footnotes omitted). The test seemed pretty clear: Upon arrest of an automobile's occupant, the police——without any additional analysis or justification——may perform an evidentiary search of the automobile.

¶69 Based on law enforcement's response to Belton, the Gant court had to address two related questions. First, whether an arrest always allows the police to perform an evidentiary search of an automobile recently occupied by the arrestee. And second, if not, whether an arrest can ever——without more—— justify an evidentiary automobile search. The latter question is the one relevant to this case, but its answer won't make any sense outside the context of the former.

¶70 The first question arose because automatic authority for evidence-gathering automobile searches doesn't fit comfortably with Belton's rationale. The basic substrate of the Belton court's reasoning comes from Chimel v. California, 395 U.S. 752 (1969), abrogation recognized by Davis v. United States, 564 U.S. 229 (2011), which addressed protective searches (as opposed to evidence-gathering searches). The Court observed that Chimel says

> a lawful custodial arrest creates a situation which
> justifies the contemporaneous search without a warrant

2

of the person arrested and of the immediately surrounding area. Such searches have long been considered valid because of the need "to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape" and the need to prevent the concealment or destruction of evidence.

Belton, 453 U.S. at 457 (citing Chimel, 395 U.S. at 763).

¶71 The Chimel rationale works when the arrestee is still in the automobile or has ready access to it. But once the arrestee is immobilized or taken from the scene of the arrest, Chimel loses its justifying power because the arrestee can no longer reach any weapons or evidence that might have been in the automobile. And yet courts have regularly used Belton to justify searches in those very circumstances. See, e.g., Gant, 556 U.S. at 346. The Gant court recognized that reading Belton to authorize such searches would "untether the rule from the justifications underlying the Chimel exception—a result clearly incompatible with our statement in Belton that it 'in no way alters the fundamental principles established in the Chimel case regarding the basic scope of searches incident to lawful custodial arrests.'" Gant, 556 U.S. at 343.

¶72 Gant's answer to the first question, therefore, was that arresting an automobile's occupant does not always justify an automobile search. So it returned Belton to its Chimel moorings by rejecting the unjustifiably broad reading it had accrued over the years. It held "that the Chimel rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." Gant, 556 U.S. at 343. That is, Chimel authorizes

3

police to conduct a protective search of an automobile as an incident to the arrest of a recent occupant.

¶73 Having held that arrests do not always justify automobile searches, the Gant court then had to determine whether they can ever, standing alone, provide a constitutionally acceptable justification. I believe Gant says they can. The Supreme Court recognized that the Chimel/Belton line of reasoning is not the exclusive basis upon which officers can search an automobile upon arrest of one of its occupants. It said:

> Although it does not follow from Chimel, we also conclude that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Thornton, 541 U.S. at 632 (SCALIA, J., concurring in judgment).

Gant, 556 U.S. at 343. Gant's specific holding makes it clear that Justice Antonin Scalia's Thornton[2] concurrence played a pivotal role in the court's reasoning:

> Consistent with the holding in Thornton v. United States, [] and following the suggestion in Justice SCALIA's opinion concurring in the judgment in that case, id. at 632, we also conclude that circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle.

Gant 556 U.S. at 335 (citation omitted); see also id. at 347 ("Unlike the searches permitted by Justice Scalia's opinion concurring in the judgment in Thornton, which we conclude today

---

[2] Thornton v. United States, 541 U.S. 615 (2004).

4

are reasonable for purposes of the Fourth Amendment, Ross[3] allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader."). So let's consider Justice Scalia's "suggestion."

¶74 Justice Scalia explained that the authority to search an arrestee without a warrant does not necessarily depend on the Chimel considerations. Instead, the justification can arise from the arrest itself: "In United States v. Robinson, 414 U.S. 218, 235 [] (1973), we held that authority to search an arrestee's person does not depend on the actual presence of one of Chimel's two rationales in the particular case; rather, the fact of arrest alone justifies the search." Thornton, 541 U.S. at 631-32 (Scalia, J., concurring). The Robinson court was quite explicit on this point:

> A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.

Robinson, 414 U.S. at 235.

¶75 Justice Scalia's Thornton concurrence makes it clear that once the authority to conduct the search exists (by virtue of the arrest), the only remaining question is its scope. The scope, he explained, depends on the nature of the search being

---

[3] United States v. Ross, 456 U.S. 798 (1982).

5

conducted——protective versus evidentiary. Commenting on the Robinson case, he agreed with the Court's rejection of the District of Columbia Circuit's conclusion that "any protective search would have to be limited by the conditions laid down in Terry[4] for a search upon less than probable cause to arrest." Robinson, 414 U.S. at 233. That is, the protective search is comprehensive, and nothing about the arrest need suggest to the officer that he is actually in danger or that he might actually find anything in need of protection.

¶76 An evidentiary search performed after arrest, however, requires a connection between the offense and the search. Justice Scalia observed that "in the context of a general evidence-gathering search, the state interests that might justify any overbreadth are far less compelling." Thornton, 541 U.S. at 632 (Scalia, J., concurring). Therefore, he concluded, "I would . . . limit Belton searches to cases where it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Thornton, 541 U.S. at 632 (Scalia, J., concurring). So Justice Scalia's Thornton concurrence was not about the authority to search, it was about the scope of the search. When conducting a protective search consequent upon an arrest, the scope is comprehensive. When conducting an evidentiary search consequent upon arrest, the scope is limited to where evidence of the crime might be.

---

[4] Terry v. Ohio, 392 U.S. 1 (1968).

6

¶77 Where that evidence might be located depends, to a very large extent, on the nature of the offense of arrest. There is good reason to believe that Gant considered the automobile search as a question of scope, as Justice Scalia plainly did, rather than one of authority, as our court does today. By way of illustrating the Court's holding, Gant juxtaposed a few illustrative cases in which the offense of arrest would not extend the evidentiary search to the automobile against a few cases in which it would:

> [W]e also conclude that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Thornton, 541 U.S. at 632 (SCALIA, J., concurring in judgment). In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence.[5] But in others, including Belton and Thornton, the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein.

Gant, 556 U.S. at 343-44. Gant did not assess the "totality of circumstances" in each case to determine whether they indicated there might be evidence relating to the offense of arrest in the automobile at issue. It simply noted the type of offense (with respect to Atwater and Knowles), and called out Belton and Thornton without any further analysis. Of all the cases cited in this illustration, Thornton is by far the most important in judging the fidelity of our conclusion to Gant's paradigm.

---

[5] See, e.g., Atwater v. Lago Vista, 532 U.S. 318, 324 (2001); Knowles v. Iowa, 525 U.S. 113, 118 (1998).

7

¶78 The court says that "[u]nlike the categorical approach, which does not utilize facts particular to the case, the reasonableness approach requires particularization." Lead op., ¶31. If the automobile search in this case may not take place without particularized suspicion "that the passenger compartment, and, specifically, the bag, might contain relevant evidence of OWI," id., ¶50, then Thornton does not belong in Gant's illustration. In Thornton, there were quite literally no particularized facts connecting the offense of arrest to Mr. Thornton's car. The police pulled him over because the license plate tags on the Chevrolet he was driving were actually issued to a Ford. Thornton, 541 U.S. at 617. Mr. Thornton exited his car, and then consented to the officer's request to search him. Id. The search of his person netted several bags of illegal narcotics. Id. The officer promptly arrested Mr. Thornton for possession of illegal narcotics and placed him in the back seat of the patrol car, whereupon the protective search justified by Chimel came to an end. Id. Nonetheless, the officer immediately commenced an evidentiary search of Mr. Thornton's car, pursuant to which he discovered a handgun (which Mr. Thornton was not allowed to possess). Id.

¶79 The search in Thornton, Gant said, was appropriate because "the offense of arrest . . . suppl[ied] a basis for searching the passenger compartment of [Mr. Thornton's] vehicle . . . ." Gant, 556 U.S. at 343. Conspicuous by its absence is any mention of factors other than the offense of the arrest. The opinion said nothing about particularized facts, or

totality of the circumstances, or any of the other phrases the court uses to explain its holding today. Mr. Thornton was arrested for drug possession ergo the police could search his car for evidence. If Gant means what our court says it means, then the Supreme Court erred pretty remarkably when it pointed to Thornton as an example of its analysis. Other than the offense of arrest, neither the Gant nor the Thornton court identified a single fact suggesting the officer might have found any evidence in the automobile. Consequently, it must necessarily be true that the United States Supreme Court believes that the offense of arrest, without more, can extend the scope of a post-arrest evidentiary search to an automobile recently occupied by the arrestee.

¶80 That principle (and its application to Thornton) leads, almost mechanically, to the conclusion that in this case the scope of the post-arrest evidentiary search appropriately encompassed Mr. Coffee's car. In Thornton, the arrestee possessed illegal drugs on his person, which was an offense sufficient to bring his car within the scope of the post-arrest evidentiary search. Here, Mr. Coffee possessed alcohol instead of narcotics, and he possessed it inside his body instead of in a plastic baggie inside one of his pockets. These distinctions appear to have no constitutional significance, nor is any such distinction on offer. Further, the offense of arrest in this case is much more directly tied to the automobile than in the Thornton matter——OWI cannot be committed without the automobile, whereas possession of illegal narcotics can. Therefore, if

possession of illegal narcotics justifies the scope of search in Thornton, it perforce justifies the search in this case.[6]

\*

¶81 Aside from my disagreement with the majority's understanding of Gant, I don't think the "reasonableness" test, at least the way we have fashioned it, can be correct. The court says "[t]hough stated in various terms, the [reasonableness] approach involves 'looking at common sense factors and evaluating the totality of the circumstances' to determine whether it was reasonable to conclude that evidence of the crime of the arrest might be found within the vehicle." Lead op., ¶30 (quoting United States v. Reagan, 713 F. Supp. 2d 724, 728 (2010) (quoting United States v. Pruitt, 458 F.3d 477, 482 (6th Cir. 2006)). Frankly, I don't think

---

[6] It is theoretically possible that the Wisconsin Constitution offers greater protection to drivers in Mr. Coffee's circumstances, but no one has made that argument in this case. Nor does any provision of our constitution come to mind that might provide that protection. And if we were addressing the application of the Gant/Thornton (concurrence) analysis for the first time to a case such as this, I'm not certain I would conclude that OWI is an offense of arrest capable of expanding the scope of the post-arrest evidentiary search to an automobile. But I believe the Supreme Court's approval of Thornton authoritatively answers that question, and this court certainly has no room to disagree. See generally, State v. Felix, 2012 WI 36, ¶36, 339 Wis. 2d 670, 811 N.W.2d 775 ("We are bound to follow the United States Supreme Court's interpretation of the Fourth Amendment that sets the minimum protections afforded by the federal constitution." (citation omitted)); and State v. Foster, 2014 WI 131, ¶57, 360 Wis. 2d 12, 856 N.W.2d 847 ("Our decisions interpreting the United States Constitution are binding law in Wisconsin until this court or the United States Supreme Court declares a different opinion or rule." (quoted source omitted)).

that's actually a test. Saying that we will consider "common sense factors" and look at the "totality of the circumstances" is really nothing more than saying we won't be obtuse. It may be right for us to disfavor "bright-line rules" in the Fourth Amendment context,[7] but this just seems like parameter-free ad-hockery.

¶82 For all these reasons, I respectfully concur with the court's judgment.

---

[7] Missouri v. McNeely, 569 U.S. 141, 158 (2013) ("While the desire for a bright-line rule is understandable, the Fourth Amendment will not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake.").

¶83  REBECCA FRANK DALLET, J.  (*dissenting*).  In Arizona v. Gant, 556 U.S. 332, 335 (2009), the United States Supreme Court announced that the Fourth Amendment[1] allows a warrantless search of a vehicle incident to arrest "when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle."[2]  I agree with the lead opinion that under Gant, the search must be analyzed by examining the totality of the circumstances, a reasonableness approach, as opposed to applying a categorical approach based solely upon the nature of the crime of arrest.  I part ways with the lead opinion, however, in the application of the reasonableness approach to the facts and circumstances of this case.  I dissent because it was not reasonable for Officer Timothy Skelton to believe that Mose B. Coffee's vehicle contained evidence relevant to his arrest for operating while intoxicated (OWI).  The search of Coffee's vehicle incident to arrest was therefore unconstitutional.

---

[1] The Fourth Amendment to the United States Constitution provides the right of citizens to be secure against unreasonable searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[2] The Gant Court also clarified that a vehicle may be searched incident to arrest when the arrestee is "within reaching distance of the passenger compartment at the time of the search."  Arizona v. Gant, 556 U.S. 332, 351 (2009).

1

I.  FACTS

¶84  The relevant facts are set forth in both the affidavit in support of the complaint and the suppression hearing testimony.

¶85  On August 30, 2017, shortly after 11:15 p.m., Officer Skelton conducted a traffic stop of Coffee's vehicle for failure to display a front license plate.  "Immediately" after Officer Skelton turned on his emergency lights, Coffee pulled over into a parking lot of a bar and parked very close to another vehicle.  According to the testimony of Officer Skelton, upon parking, Coffee "immediately was getting out of his vehicle so it was almost as if he was—knew [Officer Skelton] was behind him and was getting out quickly."  Officer Skelton testified to the following conversation with Coffee as he exited the vehicle:  "I indicated I was performing a traffic stop for the front license plate and that I wanted him to stay with his vehicle," to which Coffee "indicated that he had been stopped for that same occurrence before and that was why he was getting out to show [Officer Skelton] that he had a warning for it."  Officer Skelton described Coffee as "somewhat upset" about being stopped again for failing to have a front license plate.

¶86 Officer Skelton observed that Coffee had a distinct slur to his speech.  He instructed Coffee to "sit down in his car."  As he approached Coffee, Officer Skelton "could smell an odor of intoxicants coming from his person or from the vehicle."  He also noticed that Coffee's eyes were glazed over and bloodshot, "consistent with the odor—-the strong odor of

2

intoxicants." The body camera footage showed that during Officer Skelton's conversation with Coffee, Coffee was seated in the driver's seat with the front door open and his legs outside of the vehicle, while Officer Skelton stood several feet away. When asked where he was coming from, Coffee responded that he had been at a friend's house where he "had not had that much" to drink.

¶87 Officer Skelton asked Coffee to step out of his vehicle in order to complete some field sobriety tests "[d]ue to the level of odors and [his] observations of [] Coffee." At this point, Officer Skelton realized that he had met Coffee a couple weeks earlier. Officer Skelton noticed that Coffee was "very talkative" compared to the previous occasion where Coffee had been "very quiet." While Coffee was performing the field sobriety tests with Officer Skelton, several other officers arrived on the scene.

¶88 Officer Skelton testified that he believed Coffee was operating a motor vehicle while intoxicated: "[b]ased off my observations of his person, the conversations I had with him, the odor of intoxicants, the slurred speech, the field sobriety tests that we did." On re-direct examination, Officer Skelton reiterated that he had arrested Coffee based upon a "culmination of my observations of his person, field sobriety tests, and general odor that was coming from his person."

¶89 Officer Skelton stated that he informed the other officers on scene, Officers Benjamin Fenhouse and Brenden

3

Bonnett, that Coffee had been arrested for "operating under the influence of alcoholic beverages."

¶90 Both Officer Bonnett and Officer Fenhouse testified that they were tasked with searching Coffee's two-door vehicle. When asked what Officer Skelton told him about the nature of the search, Officer Bonnett testified:

> A.: I recall knowing the subject was in custody for impaired driving and conducted my search relevant to that.
>
> Q.: And when you say you conducted your search relevant to that, what do you mean?
>
> A.: I'd be looking for any substance in the vehicle that could impair a driver's ability to operate the motor vehicle safely.

¶91 When questioned about whether there was any smell of alcohol emanating from the vehicle, Officer Bonnett testified:

> Q.: So upon your initially opening the door, your police report doesn't mention any smells. Did you smell any alcohol?
>
> A.: I don't recall smelling any alcohol.

Officer Bonnett did not mention any smells of other intoxicants.

¶92 Officer Bonnett searched the driver-side front seat while Officer Fenhouse searched the passenger-side front seat. Neither officer found any evidence of open intoxicants. Officer Bonnett subsequently searched behind the driver's seat, where he found a cloth bag "full of stuff," including "wires, cables, and phones." Officer Bonnett testified that he looked through the bag "for any evidence which would impair a driver's ability to operate a motor vehicle." After "dig[ging] through the bag" for over a minute, Officer Bonnett found two mason jars that had

4

"flakes of what was suspected to be marijuana." Upon discovery of the mason jars, Officer Bonnett and Officer Fenhouse searched the trunk portion of the vehicle and found roughly two pounds of marijuana, along with drug paraphernalia.

## II. ANALYSIS

¶93 The lead opinion concludes that "Skelton had reasonable suspicion that the passenger compartment might contain relevant evidence of OWI" for six reasons. Lead op., ¶¶52-57.[3] As illustrated below, neither the lead opinion's reasons nor its conclusions are supported by the facts in the record.

¶94 First, the lead opinion asserts that Officer Skelton could smell an odor of intoxicants coming from the vehicle, and therefore there was reason to believe intoxicants would be found in the vehicle. Lead op., ¶52. The lead opinion reads a statement in the affidavit attached to the complaint out of context and insinuates that the smell of intoxicants emanated from the vehicle separate and apart from Coffee's person. However, the full record indicates that Officer Skelton did not articulate any particularized reason to believe the smell of alcohol emanated from the vehicle. As Officer Skelton's testimony and the body camera footage clarifies, he "could smell an odor of intoxicants coming from the vehicle" when Coffee was

---

[3] The parties do not dispute that if the search of the bag in Coffee's backseat is upheld, the subsequent search of the trunk cannot be legally challenged. At oral argument, defense counsel clarified that Coffee was not independently challenging the search of the trunk.

5

seated in it. During the suppression hearing, Officer Skelton described the odor in the following ways:

- "I believe at that point I had him sit down in his car and I could smell an odor of intoxicants coming from his person or from the vehicle."

- "Due to the level of odors and my observations of Mr. Coffee, I asked him to step out to do field sobriety tests."

- A "general odor that was coming from his person."

- "Based off my observations of his person, the conversations I had with him, the odor of intoxicants, the slurred speech, the field sobriety tests that we did, I believed he was operating a motor vehicle under the influence of intoxicants."[4]

As the body camera footage shows, Officer Skelton remained several feet away from the vehicle while Coffee was seated in the driver's seat with the door open and legs partly outside. Officer Skelton had no occasion to assess whether the vehicle independently had an odor of intoxicants.

¶95 Additionally, Officer Bonnett testified he did not smell any alcohol coming from the vehicle, which he searched while Coffee was in Officer Skelton's squad car. Officer Bonnett also did not mention the smell of any other intoxicants. Viewing the record in full, the claim that there was a reason to believe alcohol might be found in the vehicle because it smelled of intoxicants is unsupported.

---

[4] Additionally, as evidenced in the body camera footage, Officer Skelton told Coffee to exit the vehicle and perform field sobriety tests because "I can smell it on ya."

¶96 Second, the lead opinion asserts that Coffee's statement that he was coming from a friend's house provided a reason to believe that alcohol might be found in the vehicle. The lead opinion's logic is that "a private residence has alcohol only if it is brought to the residence" and therefore Coffee "might have brought the alcohol that he consumed to his friend's house and have retained some in his vehicle." Lead op., ¶53. The only authority cited is a footnote from United States v. Reagan, 713 F. Supp. 2d 724 (E.D. Tenn. 2010), a federal case upholding the suppression of evidence seized from a vehicle during a search incident to arrest. The footnote follows the magistrate judge's conclusion that a search of a vehicle under Gant requires "a particularized and articulable reason to believe that evidence of [OWI] is contained inside." Id. at 733. The footnote reads:

> Many different facts may provide a law enforcement officer with reason to believe that evidence of [OWI] is located inside the passenger compartment of a vehicle. Examples include observations of the driver drinking while driving, observations of an open container of alcohol in plain view inside the passenger compartment, statements made by the occupants of the vehicle indicating that an open container is in the passenger compartment, the smell of alcohol emanating from within the passenger compartment, or indications that the driver was traveling from a location such as a recreational area or campground where alcohol is not available unless it is transported in by private vehicle.

Id. at 733 n.7. The Reagan court determined that the vehicle's location in a recreational area did not support a search when the ranger did not articulate any particularized reason why he believed the vehicle provided evidence of OWI. Id. at 733-34.

7

The lead opinion provides no authority for the more attenuated proposition that if a person arrested for OWI is driving from a friend's house, police will have a reason to believe there is evidence of OWI in their vehicle.

¶97 Third, the lead opinion misconstrues the statement that Coffee "continued into the parking lot" to signify that "Coffee was hesitant to pull over because he knew there was something in the automobile that he should not have had." Lead op., ¶54. This interpretation directly contradicts the evidence in the record which indicates Coffee immediately pulled over. Officer Skelton was asked point blank:

> Q.: Okay. So safe to say that immediately upon turning on your emergency lights [Coffee] pulled into the parking lot?
>
> A.: Correct.

The facts of record clearly show Coffee was not hesitant to pull over. Therefore, this factor can not support the search of Coffee's vehicle.

¶98 Fourth, the lead opinion claims that "Coffee's careless parking and hasty exit from his vehicle could indicate that he was trying to distance himself from something in the vehicle that he knew he should not have had." Lead op., ¶55. The lead opinion ignores Officer Skelton's testimony that Coffee "indicated that he had been stopped for that same [front license plate violation] before and that was why he was getting out to show [him] that he had a warning for it." Coffee's careless parking and hasty exit from the vehicle fails to provide any

8

particular reason to believe that alcohol might be found in his vehicle.

¶99 Fifth, the lead opinion states that because Coffee was more talkative than he had been during one past interaction with Officer Skelton, "Skelton could have believed Coffee was nervous because he had something to hide." Lead op., ¶56 (emphasis added). Officer Skelton described Coffee as talkative while they "were walking over to the area . . . to do the field tests." The record of the past interaction consists of one statement that Coffee "had picked up an individual from a hospital from an accident," and had been "very quiet at that time."

¶100 The lead opinion uses the term "could have believed" because there is no evidence that Officer Skelton believed that Coffee's talkativeness equated to nervousness. Officer Skelton never characterized Coffee as nervous, and the State never argued that Coffee's nervousness formed a basis for the search. While a suspect's nervousness could be a factor to consider in other cases, see, e.g., State v. Morgan, 197 Wis. 2d 200, 214-15, 539 N.W.2d 887 (1995), this court is bound by the facts in the record. Coffee was never described as nervous, and therefore it could not be a factor that formed the basis for Officer Skelton's search of Coffee's vehicle.

¶101 Finally, the lead opinion justifies its conclusion based on Coffee's state of "extreme[] intoxicat[ion]." Lead op., ¶57. As support, the lead opinion cites to a court of appeals case from Kansas involving the search of a vehicle based

9

in part on an odor of intoxicant emanating from the vehicle. See State v. Ewertz, 305 P.3d 23, 28 (Kan. Ct. App. 2013). As discussed earlier, supra ¶¶94-95, there is no indication in the record that an odor of intoxicants was emanating from the vehicle.

¶102 Of greater concern is the catchall statement that "when a person is extremely intoxicated, it is not illogical to assume intoxicants could be close by." Lead op., ¶57. A finding of "extreme intoxication" invites police to always search a vehicle after an OWI arrest, despite the absence of any facts indicating there might be evidence of OWI in a particular vehicle. United States v. Taylor, 49 A.3d 818 (D.C. 2012), illustrates the distinction between the lead opinion's broad statement and the particularization required when discussing whether it is reasonable to believe evidence of OWI will be found in a vehicle.

¶103 In Taylor, the defendant rear-ended a vehicle occupied by three Deputy United States Marshals. Id. at 820. After arresting the defendant for driving under the influence, officers searched the truck and found a loaded handgun. Id. The trial court suppressed the evidence as the fruits of an unlawful search. Id. at 821.

¶104 In upholding suppression of the evidence, the Taylor court addressed Gant and discussed how the principles "apply to this arrest for driving under the influence." Id. at 826. The Taylor court reasoned:

> Whenever probable cause exists to effect an arrest for DUI, there will be evidence that the individual in

10

question is intoxicated, has been drinking recently, and has been driving despite being (and perhaps while becoming) inebriated. In this case, the police certainly had reason to believe (indeed, they had probable cause to conclude) that Taylor was drunk. The smell of alcohol was on his breath, he was swaying back and forth, he had lost control of his vehicle, and he had urinated on a nearby tree. The breath test showed a blood alcohol content of .161. This evidence gave ample reason to believe that Mr. Taylor had consumed alcohol. But there was nothing in particular——no tell-tale sign——to suggest that he had been drinking in his vehicle.

It was, of course, possible that evidence of drinking— such as empty or partially full containers of alcohol— would be found in the vehicle, just as it is possible that such evidence may be found in any vehicle driven by an intoxicated individual. But the question under . . . Gant is whether it is reasonable to believe that such evidence might be found in this specific vehicle. The suspicion must be particularized.

Id. (emphasis added).

¶105 This case lacks particular facts to suggest that alcohol might be found in Coffee's vehicle. There were signs that Coffee was intoxicated, but the State cannot rely solely on those facts to search his vehicle. The specific facts giving rise to the conclusion that Coffee was intoxicated "did not make it any more likely that he had been drinking in the vehicle." Id. at 827.

¶106 Although there was no such evidence here, there are factual circumstances which would support the search of a vehicle incident to an arrest for OWI. For example, if police observed, or were informed, that a suspect was consuming alcohol while driving or just before driving. See, e.g., City of West Bend v. Willie, No. 2018AP151, unpublished slip op., ¶1 (Wis.

11

Ct. App. Aug. 15, 2018) (noting that the police received "a report from the manager of Wendy's that Willie and his passenger had open beers in their vehicle"); State v. Relyea, 2014AP2860-CR, unpublished slip op., ¶3 (Wis. Ct. App. Jun. 18, 2015) ("The officer saw that Relyea was 'guzzling' from what appeared to be a bottle of 'microbrew' beer."). Other circumstances include where an officer observes evidence of drinking or an attempt to hide something in the vehicle. See, e.g., State v. Bons, 2007 WI App 124, ¶15, 301 Wis. 2d 227, 731 N.W.2d 367 (unusual behavior "coupled with the presence of the shot glass on the console, gave [the officer] reasonable suspicion that Bons had been committing or was about to commit a crime involving alcohol"). None of these factual circumstances were present in this case.

### III. CONCLUSION

¶107 I agree with the lead opinion that Gant, 556 U.S. 332, requires a reasonableness approach to a search incident to arrest based upon the totality of the circumstances. However, in this case, Officer Skelton did not have any particular reason to believe that Coffee's vehicle might contain evidence relevant to his arrest for OWI. The search of Coffee's vehicle incident to arrest was therefore unconstitutional and the evidence should have been suppressed.

¶108 For the foregoing reasons, I respectfully dissent.

¶109 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this dissent.

12